Filed 2/6/17

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| HILDA CUENCA et al., | |
| Plaintiffs and Appellants, | |
| | C076814 |
| v. | |
| | (Super. Ct. No. 34201380001427CUWMGDS) |
| MICHAEL COHEN, as Director, etc., et al., | |
| Defendants and Respondents; | |
| CITY OF SANTA ANA, as Successor Agency, etc., et al., | |
| Real Parties in Interest and Respondents. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge. Affirmed.

MANATT, PHELPS & PHILLIPS, Roger A. Grable, Andrew H. Struve, Andrea Ruth Bird, Cherise S. Latortue; Public Law Center, Anthony Christian Abasto and Lily Graham; Public Interest Law Project and Craig David Castellanet for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington and Jonathan M. Eisenberg, Deputy Attorneys General for Defendants and Respondents.

No Appearance for Real Parties in Interest and Respondents.


1

From 1945 until 2011, California's redevelopment agencies received their funding from a tax increment that represented the difference between the property tax "based on the assessed value of the property prior to the effective date of the redevelopment plan" and "[a]ny tax revenue in excess of that amount . . . created by the increased value of project area property." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246-247 (*Matosantos I*).) In response to the growing perception the redevelopment agencies avoided funding low- and moderate-income housing projects, the Legislature required 20 percent of the tax increment be transferred to a Low and Moderate Income Housing Fund (Housing Fund). (*Id.* at pp. 247-248; Health and Saf. Code, §§ 33334.2, 33334.4, & 33334.6.)[1] Lawsuits were also brought to secure greater percentages of the tax increment for low- and moderate-income housing projects. As pertinent to this case, the City of Santa Ana (City) entered into four stipulated judgments in 1984 and one stipulated judgment in 1994 that required the City to set aside various percentages of the tax increment for low- and moderate-income housing projects. Even after entry of the stipulated judgments, the City was slow to fund affordable housing projects, and it would eventually amass more than $56 million in moneys set aside under the stipulated judgments.

In 2011, the Legislature responded to an ailing economy by dissolving the redevelopment agencies, eliminating the tax increment, and transferring the property taxes back to local governments and schools. (Assem. Bill No. 26 (2011–2012 1st Ex. Sess.) (Assembly Bill 1x 26) enacted as Stats. 2011, 1st Ex. Sess. 2011–2012, chs. 5-6; see also Assem. Bill No. 1484 (Assembly Bill 1484) enacted as Stats. 2012, ch. 26, §§ 6-35.)[2] However, the Legislature recognized elimination of the tax increment did not also

---

[1]     Undesignated statutory references are to the Health and Safety Code.

[2]     We refer to the cumulative operation of Assembly Bill 1x 26 and Assembly Bill 1484 as the "Dissolution Law."

erase the enforceable obligations already created by the redevelopment agencies.  (See §
34171, subd. (d).)  Enforceable obligations were to be paid -- but only under the oversight
of the California Department of Finance (DOF) and State Controller.  (*City of Emeryville
v. Cohen* (2015) 233 Cal.App.4th 293, 298-299 (*City of Emeryville*).)  Unencumbered
funds must be transmitted to the county auditor-controller for return to the taxing entities.
(§ 34177, subd. (d).)

The issues presented here concern the effects of the elimination of the tax
increment and dissolution of the Santa Ana Redevelopment Agency on the five stipulated
judgments.  In this case, petitioners Hilda Cuenca, Claudia Castaneda, Enimia
Hernandez, and Evangelina Avalos, and Habitat for Humanity of Orange County
((Habitat) cumulatively Cuenca) sought a writ of mandate to overturn DOF's
determination that approximately $30 million set aside under the stipulated judgments
was unencumbered and must be remitted to the county auditor-controller.  The trial court
affirmed DOF's determination except for a $3.5 million loan pledged to Habitat for
construction of 17 affordable houses.

On appeal, Cuenca contends (1) the five stipulated judgments are enforceable
obligations under the Dissolution Law, (2) the tax increment moneys set aside under the
stipulated judgments remain available for use by the Santa Ana Redevelopment Agency's
housing successor, (3) the stipulated judgments are contracts subject to protections of the
contract clauses of the United States and California Constitutions, and the Dissolution
Law may not require the diversion of tax increment moneys to the county auditor-
controller, and (4) DOF's "taking of $30 million in pre-dissolution tax increment violates
[California Constitution article XIII, section 25.5(a)(3) (Proposition 1A) and section
25.5(a)(7) (Proposition 22)]."[3]

---

[3]     As summarized by the California Supreme Court, "Proposition 1A prevented the
state from statutorily reducing or altering the existing allocations of property tax among

3

On our own motion, we asked the parties to address whether this case has become moot after a settlement agreement was reached in *Peebler v. Department of Finance et al.* (Third District Court of Appeal No. C073698) the trial court found to be a related case. We also consider respondents' contention Habitat lacks standing in this appeal.

We conclude Habitat has standing to participate in this appeal, and this case is not moot. Petitioners in this case were not parties to the settlement in *Peebler v. Department of Finance et al.*, and the continuing validity of the stipulated judgments after enactment of the Dissolution Law remains to be resolved.

On the merits, we conclude the stipulated judgments meet the definition of enforceable obligations under the Dissolution Law. However, there are no remaining terms to be fulfilled under the stipulated judgments once the Dissolution Law became effective. The Dissolution Law eliminated the tax increment that provided the only source of funding subject to the stipulated judgments. Nothing in the stipulated judgments requires the tax increment to continue to be collected after the effective date of the Dissolution Law. And the stipulated judgments do not purport to prevent the Legislature from recapturing unspent tax increment funds by subsequent legislation. Thus, the moneys already set aside under the stipulated judgments, but that are unencumbered, must be remitted to the county auditor-controller.

---

cities, counties, and special districts," but "did not extend its protections to redevelopment agencies." (*Matosantos I, supra*, 53 Cal.4th at p. 249.) And Proposition 22 prohibited the Legislature from requiring redevelopment agencies "to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction." (*Id.* at p. 250.)

4

We also conclude DOF's determination that the Dissolution Law requires the turning over of unencumbered moneys to the county auditor-controller does not violate the contract clauses of the United States or California Constitutions.

Finally, we determine the Dissolution Law's requirement that unencumbered funds be remitted to the county auditor-controller does not violate Proposition 1A or Proposition 22. This court rejected a nearly identical challenge to the Dissolution Law under Proposition 1A in *City of Cerritos v. State* (2015) 239 Cal.App.4th 1020. And the Supreme Court rejected a similar challenge under Proposition 22 in *Matosantos I, supra*, 53 Cal.4th 231. The reasoning employed in these decisions applies here and compels the conclusion the Dissolution Law, as implemented in this case, does not violate Propositions 1A or 22.

Accordingly, we affirm the judgment.

BACKGROUND

### *The Community Redevelopment Law* (*§ 33000 et seq.*)

In 1945, the Legislature authorized cities and counties to form community redevelopment agencies to address issues of urban decay in California. (Stats. 1945, ch. 1326, § 1, p. 2478 et seq.; *Matosantos I*, *supra*, 53 Cal.4th at p. 245.) In 1951, the Legislature renamed the statutory scheme as the Community Redevelopment Law (CRL) and codified it at section 33000 et seq. (*Matosantos I*, at pp. 245-246; Stats. 1951, ch. 710, § 1, p. 1922 et seq.) "The Community Redevelopment Law 'was intended to help local governments revitalize blighted communities.' " (*Matosantos I*, at p. 246, quoting *City of Cerritos v. Cerritos Taxpayers Assn*. (2010) 183 Cal.App.4th 1417, 1424 (*Cerritos Taxpayers Assn.*).) Included in the aim of the CRL was the goal "to increase the supply of low- and moderate-income housing." (*Cerritos Taxpayers Assn.* at p. 1424.)

To fund their projects, the redevelopment agencies "rel[ied] on tax increment financing, a funding method authorized by article XVI, section 16 of the state

5

Constitution and section 33670 . . . . (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866; *City of El Monte* [*v. Commission on State Mandates* (2000) 83 Cal.App.4th 266,] 269–270.) Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) [were] allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—[went] to the redevelopment agency for repayment of debt incurred to finance the project. (Cal. Const., art. XVI, § 16, subds. (a), (b); § 33670, subds. (a), (b); *City of Dinuba*, at p. 866.) In essence, property tax revenues for entities other than the redevelopment agency [were] frozen, while revenue from any increase in value [was] awarded to the redevelopment agency on the theory that the increase [was] the result of redevelopment. (*Cerritos Taxpayers Assn*., at p. 1424.)" (*Matosantos I*, *supra*, 53 Cal.4th at pp. 246-247.)

Over the years, "a perception had grown that some redevelopment agencies were used as shams to divert property tax revenues that otherwise would fund general local governmental services, and legislative efforts were made to address these concerns." (*City of Emeryville, supra,* 233 Cal.App.4th at p. 298, citing *Matosantos I, supra*, 53 Cal.4th at pp. 247–248.) Among these, the Legislature required "redevelopment agencies to make certain transfers of their tax increment revenue for other local needs" including a provision that "20 percent of the revenue generally must be deposited in a fund for provision of low- and moderate-income housing. (§§ 33334.2, 33334.3, 33334.6; see *City of Cerritos . . . supra,* 183 Cal.App.4th at p. 1424.)" (*Matosantos I, supra,* 53 Cal.4th at pp. 247-248.) This requirement addressed the trend that "redevelopment agencies . . . historically devoted their resources to the commercial sector, rather than low-income housing development." (*Craig v. City of Poway* (1994) 28 Cal.App.4th 319, 330.)

*Dissolution of the Redevelopment Agencies*

In the midst of California's fiscal emergency in 2011, the Legislature enacted two measures that implemented the dissolution of the roughly 400 redevelopment agencies then in existence. (Assem. Bill Nos. 26 & 27 (2011–2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011–2012, chs. 5–6 (Assembly Bill 1X 26 and Assembly Bill 1X 27); see generally *Matosantos I*, *supra*, 53 Cal.4th at pp. 241, 245–246.) Assembly Bill 1x 26 required the redevelopment agencies to conclude their activities and dissolve. (*Matosantos I* at p. 241.) Although Assembly Bill 1x 27 would have allowed redevelopment agencies to continue if they paid into funds benefitting schools and special districts, the California Supreme Court struck down this alternative as conflicting with the California Constitution's prohibition on requiring such payments. (*Id.* at p. 242; Cal. Const. art. XIII, § 25.5.) After *Matosantos I*, redevelopment agencies had no option but to wind down and dissolve. (*City of Emeryville, supra,* 233 Cal.App.4th at p. 298.)

Winding down California's redevelopment agencies and their projects proved to be no simple task. A year after enacting Assembly Bill 1x 26, the Legislature passed Assembly Bill No. 1484 to clarify and tighten restrictions on the funds from redevelopment projects. (Stats. 2012, ch. 26, §§ 6-35, pp. 1093-1124.) In addition to winding down the redevelopment agencies, the Legislature also eliminated the tax increment. Subdivision (a) of section 34189 provides in pertinent part: "all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies, including, but not limited to, Sections 33445, 33640, 33641, and 33645, and subdivision (b) of Section 33670, shall be inoperative."

Although the Legislature eliminated California's redevelopment agencies, it provided for the continuing validity of enforceable obligations previously created by the redevelopment agencies. As pertinent to this case, enforceable obligations include court judgments and settlement agreements. (§ 34171, subd. (d)(1)(D).) To ensure that

7

claimed enforceable obligations met the criteria set forth in the Dissolution Law, the Legislature provided that "[e]ach oversight board . . . has a fiduciary duty towards 'holders of enforceable obligations and the taxing entities that benefit from distributions of property tax' (§ 34179, subd. (i)) to carry out its duties, which include the duty to review specified actions by the successor agencies, including '[e]stablishment of the Recognized Obligation Payment Schedule.' (§ 34180, subd. (g).) The recognized obligation payment schedule (ROPS) is 'the document setting forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period . . . .' (§ 34171, subd. (h).) The successor agency has a duty to '[c]ontinue to make payments due for enforceable obligations.' (§ 34177, subd. (a).) Thus, to help ensure the orderly windup and dissolution of the redevelopment agencies, the ROPS lists what remaining enforceable obligations exist.

"To ensure each ROPS is accurate, both the [DOF] and the State Controller . . . have the authority to require documentation of purported enforceable obligations, and they and any 'taxing entity' have authority to sue 'to prevent a violation under this part . . . .' (§ 34177, subd. (a)(2).) The [DOF] also has authority to 'review an oversight board action taken pursuant to' Assembly Bill 1X 26. (§ 34179, subd. (h).)" (*City of Emeryville*, *supra*, 233 Cal.App.4th at pp. 298-299, fn. omitted.)

Under the Dissolution Law, successor agencies could either: retain responsibility for the "housing functions" previously performed by the redevelopment agencies, or transfer the responsibility to a "housing successor." (§ 34176, subd. (a)(1) & (3).) If a successor agency transferred responsibility to a housing successor, the housing successor assumed "all rights, powers, duties, obligations, and housing assets," *except for* "any amounts on deposit in the [Housing Fund] and enforceable obligations retained by the successor agency." (*Id*., subd. (a)(1).) DOF is charged with responsibility to review whether a "transferred asset is deemed not to be a housing asset," in which case it must be returned for allocation to the taxing entities. (*Id*., subd. (a)(2).)

8

Under section 34177, "Successor agencies are required to  [¶] . . . [¶]  (d) Remit unencumbered balances of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities, including, but not limited to, the unencumbered balance of the [Housing Fund] of a former redevelopment agency."  The Dissolution Law requires successor agencies to retain licensed accountants "to conduct a due diligence review to determine the unobligated balances available for transfer to taxing entities" that are (1) held in the Housing Fund, and (2) former redevelopment agency assets held by the successor agency in any other form or fund.  (§ 34179.5, subds. (a), (c)(1)-(5).)  The successor agency must review and approve each due diligence review, followed by review and approval by DOF.  (§ 34179.6.)  Under section 34179.6, DOF has the prerogative to adjust the amounts deemed unencumbered. (§ 34179.6, subds. (c) & (d).)  The successor agencies then remit the unencumbered moneys to the county auditor-controller, who transfers the moneys to the taxing entities. (§ 34179.6, subd. (f).)

### *The Five Stipulated Judgments Entered into by the Community Redevelopment Agency of the City of Santa Ana (Santa Ana Redevelopment Agency)*

The Santa Ana Redevelopment Agency was established in 1973 and eventually created six merged redevelopment areas.  Litigation focusing on five of these redevelopment areas resulted in stipulated judgments, four of which were entered in 1984 and one in 1994.  For convenience, the four 1984 stipulated judgments are referred to by the lead plaintiffs:  Rodriguez, Edwards, Gibson, and Peebler.  The 1994 stipulated judgment is referred to as Gonzalez.  As pertinent to this case, each of the stipulated judgments incorporated by reference resolutions by the City that required the Santa Ana Redevelopment Agency to set aside various percentages of the received tax increment to fund low- and moderate-income housing projects.  Rodriguez required a 30 percent set aside, Edwards required 30 percent, Gibson required 60 percent, Peebler required 20 percent, and Gonzales required 30 percent.

As required by the stipulated judgments, portions of the tax increment were set aside in the Santa Ana Redevelopment Agency's low- and moderate-income housing fund. By February 2012, more than $56 million had been collected for use on low- and moderate-income housing projects within the redevelopment areas of the City of Santa Ana. Most of the funds were unencumbered with the notable exception of a March 2011 development agreement between the Santa Ana Redevelopment Agency and Habitat that provided for a loan of about $3.5 million for construction of 17 affordable homes.

In February 2012, approximately $56 million was transferred from the redevelopment agency's low- and moderate-income housing fund to the housing successor for deposit into a new Low and Moderate Income Housing Asset Fund (Asset Fund). (See § 34176, subd. (d) [requiring, with an exception not pertinent here, that "any funds transferred to the housing successor, together with any funds generated from housing assets . . . shall be maintained in a separate Low and Moderate Income Housing Asset Fund which is hereby created in the accounts of the housing successor"].) Under the Dissolution Law, housing successors may assume "housing assets," that include "[a]ny funds that are encumbered by *an enforceable obligation* to build or acquire low- and moderate-income housing, as defined by the Community Redevelopment Law . . . unless required in the bond covenants to be used for repayment purposes of the bond." (§ 34176, subd. (e)(2), italics added.) However, successor agencies were required to "[r]emit *unencumbered balances* of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities, including, but not limited to, the unencumbered balance of the [Housing Fund] of a former redevelopment agency." (§ 34177, subd. (d), italics added.)

## DOF Disapproves of the Recognized Obligation Proposal Filed by the Successor Agency

In February 2012, the Santa Ana Redevelopment Agency dissolved and the City became the successor agency. The City designated the Santa Ana Housing Authority as the housing successor to retain the former redevelopment agency's housing assets and functions. The trial court found that "the record [does] not clearly state what happened, however, it appears that $26,080,925 in cash from the former [redevelopment agency's Housing Fund] was transferred to the Housing Successor."

The successor agency's due diligence review had concluded only $30,593,530 had been improperly transferred. However, DOF completed its due diligence review in November 2012 when it determined that "[c]ash and cash equivalents improperly transferred" to the housing authority "totaled $56,674,455." As a result, DOF adjusted the amount by $26,080,925.

Over the next 17 months, DOF several times revised the amount of money held in the Asset Fund it deemed to be unencumbered. By April 2013, DOF acknowledged several enforceable obligations involving the Santa Ana Station District New Construction, Vista Del Rio Housing Partners LP, and WBB New Construction. DOF also approved various payments listed on the successor agency's recognized obligation proposal -- including $1,543,728 for a project undertaken by Habitat. The successor agency, however, sought $2,337,191 as full payment for its obligation to Habitat. Ultimately, DOF refused to recognize $33,174,377 in funds set aside under the five stipulated judgments as enforceable obligations.

## Cuenca's Petition for Writ of Mandate

Cuenca filed an action for mandamus, injunction, and declaratory relief to require DOF to recognize the five stipulated judgments as enforceable obligations under the Dissolution Law and to compel DOF to release funds to Habitat for construction of 17 low-income houses. DOF opposed the petition.

11

The trial court granted in part and denied in part Cuenca's writ petition. The trial court found the Habitat development agreement "is a 'contractually dedicated' enforceable obligation," and allowed the housing successor to retain the entire amount claimed by petitioners as owing to Habitat without having to list the amount on any future recognized obligation proposals. DOF has not appealed, and this portion of the trial court's decision is not an issue on appeal.

Except for the determination the Habitat real estate construction loan constituted an enforceable obligation, the trial court denied Cuenca's writ petition in all other respects. The trial court concluded the stipulated judgments do not constitute enforceable obligations to set aside money for low-income housing after the Legislature implemented the dissolution of California's redevelopment agencies. The trial court reasoned the Legislature had the power to eliminate the tax increments regardless of the terms of the stipulated judgments. Finding the "funds set aside for these [stipulated judgments] are unencumbered," the trial court ordered that the funds "must be remitted" to the taxing entities. In so ordering, the trial court rejected Cuenca's contention that remittance of the funds set aside under the stipulated judgments violates Propositions 1A and 22. The trial court also rejected Cuenca's assertion remittance of the funds violates the doctrine of separation of powers or represents an unconstitutional impairment of contracts.

From the trial court's judgment, Cuenca timely filed a notice of appeal.

DISCUSSION

I

*Mootness*

On our own motion, we asked the parties to address whether this appeal became moot, in whole or in part, after the "Notice of Settlement of Entire Case" was filed in *Peebler v. Matosantos* (Super. Ct. Sacramento Co., 2012, No. 34-2012-800001172; Third District Court of Appeal No. C073698, dism. Jan. 12, 2015). We have received and

12

considered supplemental briefing from Cuenca on behalf of appellants and the Attorney General on behalf of respondents. We have also had the opportunity to review the *Peebler v. Matosantos* settlement agreement entered into in November 2014 (2014 *Peebler* settlement agreement). Based on our review, we determine this appeal is not moot.

## A.

### *Prior Related and Unrelated Cases*

The redevelopment agency district at issue in this case has also been the subject of other, prior litigation in the Sacramento County Superior Court.[4] (*Peebler v. Matosantos* (Super. Ct. Sacramento Co., 2012, No. 34-2012-800001172); *Santa Ana Station District LLC et al. v. Matosantos* (Super. Ct. Sacramento Co., 2013, No. 34-2013-800001477).)

After Cuenca filed a notice of a related case, a Sacramento County Superior Court judge found *Peebler v. Matosantos* (Super. Ct. Sacramento Co., 2012, No. 34-2012-800001172) was related to this case "because they involve the same or similar claims and many of the same parties; arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact; and are likely for other reasons to require substantial duplication of judicial resources if heard by different judges." Consequently, this case was reassigned to the judge who was also presiding over *Peebler v. Matosantos*. Cuenca filed a peremptory challenge under Code of Civil Procedure section 170.6, and this case was transferred to a different judge.

---

[4] Under section 34168, subdivision (a), the Sacramento County Superior Court is the venue for "any action contesting the validity" of the Dissolution Law. (*City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 492, fn. 1.)

13

*Peebler v. Matosantos, supra,* Sacramento County No. 34-2012-800001172 resulted in a settlement agreement to which the petitioners in this case were not parties. Under the terms of the settlement agreement, the City agreed to establish a $4.7 million "Peebler Fund" for the construction of public improvements in the South Main Corridor area as well as administrative and related costs.  The settlement agreement did not address the funds set aside for low- and moderate-income houses that are at issue in this case.

At the same time the trial court determined this case was related to *Peebler v. Matosantos, supra,* Sacramento County No. 34-2012-800001172, it found this case was not related to *Santa Ana Station District LLC et al. v. Matosantos*.  The court found: "In *Santa Ana Station District LLC et al. v. Matosantos*, the petitioners challenged the [DOF]'s refusal to recognize as enforceable obligations various agreements related to a particular affordable housing project, which petitioners allege were to be funded with moneys available to the former redevelopment agency in the [Housing Fund]. This action settled and the case was dismissed.  The court finds that *Cuenca v. Department of Finance* is not related to *Santa Ana Station District LLC, et al. v. Matosantos.*"

**B.**

***Justiciability***

"California courts will decide only justiciable controversies.  (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813; see 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 21, pp. 84–86.)  The concept of justiciability is a tenet of common law jurisprudence and embodies '[t]he principle that courts will not entertain an action which is not founded on an actual controversy. . . .'  (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 (*California Water*); see also *Stonehouse Homes v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 540 (*Stonehouse Homes*).)  Justiciability thus 'involves the intertwined

14

criteria of ripeness and standing. A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' (*California Water*, at p. 22, fn. omitted.) But 'ripeness is not a static state' (*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1183), and a case that presents a true controversy at its inception becomes moot ' "if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character" ' (*Wilson v. L.A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453)." (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573 (*Wilson & Wilson*).)

"A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 120.) Because ' "the duty of . . . every . . . judicial tribunal is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it[,] [i]t necessarily follows that when . . . an event occurs which renders it impossible for [the] court, if it should decide the case in favor of plaintiff, to grant him [or her] any effectual relief whatever, the court will not proceed to formal judgment. . . ." [Citation.]' (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863.) The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227; see also *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 [case moot where contract with county had expired and court could not award it to disappointed bidder].) If events have made such relief impracticable, the controversy has become 'overripe' and is therefore moot. (*California Water, supra*, 253 Cal.App.2d at

pp. 23–23, fn. 9; see *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132.)" (*Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1574.)

This case is not moot because none of the claims advanced by Cuenca was resolved by the settlement agreement in *Peebler v. Matosantos*. And there is no dispute the trial court properly concluded *Santa Ana Station District LLC, et al. v. Matosantos* was not related to this case. Consequently, the outcomes of the earlier related and unrelated cases do not moot this case even though they involved issues arising out of the City's redevelopment projects.

Moreover, the issues presented are subject to relief within the jurisdiction of this court. Cuenca and DOF disagree as to whether the tax increment must still be collected under the terms of the five stipulated judgments. And the parties disagree as to whether the moneys already collected must be spent on low- and moderate-income housing under the stipulated judgments or must be remitted to the county auditor-controller for transfer to the taxing entities. For these reasons, there is an actual and ongoing controversy between the parties that is not moot.

The Attorney General argues the 2014 *Peebler* settlement agreement "mooted the question of whether" the successor agency "could keep tens of millions of dollars of already accumulated tax-increment funds that the Redevelopment Agency of the City of Santa Ana had set aside from 1984 to 2011 . . . ." In so arguing, the Attorney General acknowledges that "the questions of whether and to what extent, under the RDA Dissolution Law, the 'affordable-housing' provisions of the five vintage settlement agreements are enforceable obligations of the Successor Agency *going forward*, and therefore payable from future property-tax revenues, are not moot and remain to be determined . . . ." We agree the prospective operation of the stipulated judgments remains an issue to be addressed.

However, we disagree with the Attorney General's argument the 2014 *Peebler* settlement agreement resolved the issue of the proper disposition of moneys collected

16

before 2011.  The 2014 *Peebler* agreement did not purport to resolve the controversy between the petitioners in this case and DOF.  Indeed, the Attorney General notes that "DOF was not a party to, and did not even know in advance about, the 2014 *Peebler* settlement.  DOF neither imposed nor accepted any obligations in connection with that settlement . . . ."  And as we have noted, none of the petitioners in this case was party to the 2014 *Peebler* settlement agreement.  In short, the 2014 *Peebler* settlement agreement did not resolve any of the issues presented in this appeal.

## II

### *Standing of Habitat*

The Attorney General contends Habitat lacks standing in this appeal.  Specifically, the Attorney General argues DOF has already recognized Habitat's entitlement to payment under its affordable housing redevelopment contract and Habitat "has no other pertinent contracts with any Santa Ana entity, nor is H[abitat] standing in for an absent party here."  We conclude Habitat has standing to appeal.

As a jurisdictional prerequisite, a petitioner must have standing in order to invoke the power of a court to grant writ relief.  (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1232 (*Waste Management*) disapproved on another point in *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 167-168, 170 & fn. 5 (*Save the Plastic Bag*).)  "As a general rule, a party must be 'beneficially interested' to seek a writ of mandate.  (Code Civ. Proc., § 1086.)  'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.  [Citations.]  As Professor Davis states the rule:  "One who is in fact adversely affected by governmental action should have standing to challenge that action if it is judicially reviewable."  (Davis, 3 Administrative Law Treatise (1958) p. 291.)'  (*Carsten v. Psychology Examining Com.*

17

(1980) 27 Cal.3d 793, 796–797.)  The beneficial interest must be direct and substantial. (*Parker v. Bowron* (1953) 40 Cal.2d 344, 351; *Braude v. City of Los Angeles* (1990) 226 Cal.App.3d 83, 87; 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 75, p. 956.)"  (*Save the Plastic Bag,* at p. 165.)

Petitioners in this case sought to overturn DOF's denial, in part, of the successor agency's claimed obligation for $3.5 million related to Habitat's construction of 17 affordable homes.  As the writ petition alleged, DOF's "denial and delay of payments, jeopardizes the ability of [HABITAT] to complete the project."  The trial court agreed and found the Habitat project "is a 'contractually dedicated' enforceable obligation" for which "the Housing Successor is entitled to retain the entire amount owing under the Habitat [project agreement] without the Successor Agency having to apply for those moneys on future" recognized obligation payment schedules.

The Attorney General contends Habitat lacks standing because it has secured its relief and is not aggrieved by the judgment.  We reject the contention.  Although Habitat could not appeal from the portion of the judgment in its favor, that does not mean it lacks standing to continue to participate.  The petition was filed with the purpose of representing the interests of persons requiring low- and moderate-income housing in Santa Ana.  In essence, this action was filed in the public interest based on a claim that moneys collected under stipulated judgments still remain available to fund low- and moderate-income housing in Santa Ana.  " ' "[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he [or she] has any legal or special interest in the result, since it is sufficient that he [or she] is interested as a citizen in having the laws executed and the duty in question enforced." ' (*Bd. of Soc. Welfare v. County of L.A.* (1945) 27 Cal.2d 98, 100–101.)"  (*Save the Plastic Bag, supra,* 52 Cal.4th at p. 166.)

Moreover, Habitat has a particular interest in availability of the tax increment funds for low- and moderate-income housing in Santa Ana. The petition stated Habitat "creates home ownership and home repair opportunities to qualified, hardworking, low-income families in need of safe, affordable homes." Thus, Habitat stands to further its mission by securing moneys through this action to fund construction of low-income housing in addition to the 17 houses for which the trial court confirmed the previously collected tax increment may be spent. Habitat's interest in the outcome of this litigation confers it with standing.

## III

### *Whether the Tax Increment Must Continue to be Collected under the Stipulated Judgments*

Cuenca contends the five stipulated judgments meet the definition of enforceable obligations under the Dissolution Law so that the tax increment must continue to be made available as required by the judgments. We do not interpret the stipulated judgments to require the tax increment to be collected after the Legislature eliminated tax increment funding of redevelopment projects.

### A.

### *Principles of Statutory and Contract Construction*

This issue turns on questions of statutory construction for the panoply of statutes enacted to wind down the state's redevelopment agencies. In construing statutes, our goal is to ascertain and effect the legislative intent. (*City of Cerritos v. State, supra,* 239 Cal.App.4th at p. 1034.) In *City of Cerritos v. State*, this court reiterated well settled canons of statutory construction in explaining that "we first look to the language itself. (*Mejia* [*v. Reed* (2003)] 31 Cal.4th [657,] 663.) 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature.' . . . (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) 'But, the "plain meaning" rule does not prohibit a court from determining whether the

19

literal meaning of a statute comports with its purpose. . . .' (*Ibid*.) Moreover, ' "where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." [Citation.]' (*People ex rel. San Francisco Bay Conservation & Development Com. v. Emeryville* (1968) 69 Cal.2d 533, 543–544.)" (*City of Cerritos v. State*, *supra*, at pp. 1034-1035.)

When the statutory language is ambiguous or reasonably susceptible to more than one interpretation, "we refer to other indicia of legislative or voter intent such as legislative history, public policy, or analyses and arguments contained in the voter information guide. (*Robert L.* [*v. Superior Court* (2003)] 30 Cal.4th [894,] 900–901; *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519, 106.) Our task is simply to interpret and apply the language of a statute or initiative so as to effectuate the Legislature's or electorate's respective intent. (*Ibid*.) [¶] Courts must also construe words in context, 'keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' (*Dyna–Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 (*Dyna–Med*).) Every statute, then, should be construed in light of the whole system of law of which it is a part, so that all may be harmonized and have effect. (*Mejia, supra,* 31 Cal.4th at p. 663.)" (*City of Cerritos v. State*, *supra*, 239 Cal.App.4th at p. 1035.)

DOF asserts its interpretation of the governing statues should be accorded deference. "While we accord at least ' "weak deference" ' to an agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1215–1216 [contrasting the ' "strong deference" ' standard in other jurisdictions]), the issue nonetheless is one subject to our de novo review (*State Compensation Ins. Fund v. Brown*

20

(1995) 32 Cal.App.4th 188, 199; *Troy Gold Industries, Ltd. v. Occupational Safety & Health Appeals Bd.* (1986) 187 Cal.App.3d 379, 387, fn. 4)." (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 47.)

**B.**

### *The Stipulated Judgments are Enforceable Obligations*

Subdivision (d)(1) of section 34171 defines "[e]nforceable obligations" under the Dissolution Law to include bonds issued for redevelopment projects, loans incurred by redevelopment agencies, payments required by federal and state governments, judgments and settlements, and any other "legally binding and enforceable agreement or contract that is not otherwise void." (§ 34171, subd. (d)(1)(E).) Subdivision (d)(1)(D) of section 34171 also includes among enforceable obligations, "Judgments or settlements entered by a competent court of law or binding arbitration decisions against the former redevelopment agency, other than passthrough payments that are made by the county auditor-controller pursuant to Section 34183."

The five stipulated judgments in this case meet the definition of enforceable obligations under the Dissolution Law. (§ 34171, subd. (d)(1)(D).) Each stipulated judgment was entered by the superior court, and there is no contention the trial court acted in excess of its jurisdiction in doing so. Moreover, there is no assertion of fraud or mistake by the parties reaching the agreements memorialized in the stipulated judgments.

**C.**

### *The Stipulated Judgments Do Not Require Continued Collection of the Tax Increment after its Elimination*

Our conclusion that the stipulated judgments meet the definition of enforceable obligations under the Dissolution Law does not answer the question of whether they require continued collection of the tax increment. Accordingly, we turn to the language of the stipulated judgments to ascertain what actions, if any, they compel.

21

" ' " '[A] stipulation or consent judgment, being regarded as a contract between the parties, must be construed as any other contract. [Citations.] . . . .' [Citation.]" [Citation.]' Unless the interpretation of a contract turns on the credibility of extrinsic evidence, the matter is a question of law. (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 382.) We review the trial court's determination de novo. (*Ibid.*; *Lamantia v. Voluntary Plan Administrators* (9th Cir. 2005) 401 F.3d 1114, 1118.)" (*Roden v. AmerisourceBergen Corp.* (2007) 155 Cal.App.4th 1548, 1561.) And "[u]nder statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. (See, e.g., *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807; *Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115.)" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.)

Accordingly, we proceed to examine the language of the five stipulated judgments. The 1984 stipulated judgments in Rodriguez, Edwards, and Gibson use identical language (except for the specific percentage) to describe the redevelopment agency's obligation to set aside a portion of the tax increment. Rodriguez provides a representative example where it states:

"Tax Increments [¶] Thirty percent (30%) *of the tax increments* or tax increment generated or related revenues, or moneys repayable from tax increment from the project area shall be set aside solely and exclusively for low and moderate income housing and

related activities such as rebates, low interest rehabilitation loans, public improvements or assisting in low income housing construction." (Italics added.)

The 1984 Peebler stipulated judgment used the same language, but also added:

"Twenty percent (20%) *of the tax increments* shall be utilized for public improvements including parking and financial incentives such as rebates and commercial improvements and reduced interest rehabilitation loans on Main Street North of Warner Avenue and on First Street, provided, however, no Agency funds shall be used for center dividers on Main Street between First Street and Warner Avenue or on First Street." (Italics added.)

Coming a decade later, the 1994 Gonzalez resolution used different language to describe the obligation to set aside money for low- and-moderate income housing, in pertinent part as follows:

"[Housing Fund] Set Asides. [¶] a. Notwithstanding Section 33334.2 or any other provision of law, not less than *30% of all taxes which are annually allocated to the Agency* pursuant to . . . §33670 during the life of the Bristol Corridor Project Area, as amended, shall be set-aside annually and held in a separate [Housing Fund] ('L & M Fund'), except that this percentage shall be increased to the extent that the percentage in . . . §33334.2[, subd. ](a) is increased above 30%. [¶] b. The percentage specified in this paragraph shall apply to the gross amount *of taxes allocated to the Agency* pursuant to Section 33670, including any monies which the Agency transfers to other taxing agencies, notwithstanding any provisions of such agreements, except that monies which other taxing agencies elect to have allocated to them under Section 33676 shall not be included in the amounts allocated to the Agency." (Italics added.)

The clear import of each of the stipulated judgments is a certain percentage *of the tax increment* received by the Santa Ana Redevelopment Agency was to be set aside for low- and moderate-income housing. The Legislature's elimination of the tax increment had the effect of extinguishing the obligation of the redevelopment agency (or its

successor agency) to set aside anything because any percentage of zero is zero. None of the stipulated judgments guaranteed any minimum level of funding for low- and moderate-income housing projects in the City of Santa Ana. The stipulated judgments do not require further set aside of any moneys from the tax increment because the redevelopment agencies (and their successor agencies) no longer receive any tax increment.

Cuenca argues the stipulated judgments are enforceable obligations requiring their terms to continue to be fulfilled, including the requirement to collect and set aside funds for low- and moderate-income housing. In support, Cuenca argues the tax increment continues to exist as property taxes. We reject the argument for two reasons.

First, the stipulated judgments could not have imposed a requirement that the Santa Ana Redevelopment District continue to collect the tax increment even after its elimination by the Legislature because the redevelopment agencies had no authority to tax. The California Supreme Court has held that "[r]edevelopment agencies generally cannot levy taxes." (*Matosantos I*, *supra*, 53 Cal.4th at p. 246; accord *Cerritos Taxpayers Assn.*, *supra*, 183 Cal.App.4th at p. 1424 ["Local redevelopment agencies have no power to tax"].) Consequently, the stipulated judgments represented the outer limit to which the Santa Ana Redevelopment Agency could agree, namely to allocate a certain percentage *of the tax increment received* to low- and moderate-income housing.

Second, the tax increment has been eliminated and is no longer received by the now-dissolved Santa Ana Redevelopment Agency or its successor agency. Subdivision (a) of section 34189 declares that "all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies, including, but not limited to, Sections 33445, 33640, 33641, and 33645, and subdivision (b) of Section 33670, shall be inoperative." Because no tax increment is received, none must be set

24

aside under the stipulated judgments. The continued payment of other obligations such as bonds and contracts that became valid before the dissolution of the redevelopment agencies represents the Legislature's determination not to default on redevelopment agency obligations. However, these continuing obligations do not establish the continuing existence of the tax increment. To the contrary, the Legislature's funding of these continuing obligations out of property taxes confirms the elimination of the tax increment.

In short, the stipulated judgments cannot be read to impose any obligation on the successor agency or housing successor to continue to collect the tax increment or set aside any portion of it for low- and moderate-income housing. This conclusion, however, does not resolve the issue of the proper disposition of the tax increment collected before the elimination of the tax increment and not yet spent. Thus, we turn to the issue of the moneys set aside under the stipulated judgments prior to the effective date of the Dissolution Law.

## IV

### *Past Tax Increment Moneys Collected*

Cuenca contends the moneys collected prior to the Dissolution Law's elimination of the tax increment under the terms of the stipulated judgments but not yet spent must still be made available for low- and moderate-income housing in Santa Ana. We are not persuaded.

### A.

### *The Stipulated Judgments Require only the Setting aside of Portions of the Tax Increment*

As determined above, in part III C., the five stipulated judgments require only the setting aside of specified percentages of the tax increment received by the Santa Ana Redevelopment Agency. Although the stipulated judgments identify the general locations of the redevelopment areas within the City of Santa Ana where the set-aside

25

funds should be spent, the stipulated judgments themselves do not constitute contracts to construct any housing.

In November 2012, DOF determined about $52.3 million of the approximately $56.7 transferred to the housing successor's Asset Fund were unencumbered balances because they were not subject to contracts for construction or loans pledged to facilitate construction. Although DOF subsequently adjusted the amount several times, it ultimately deemed a total of approximately $33.2 million to be unencumbered.

**B.**

***The Prohibition on New Redevelopment Projects after June 2011***

Since June 2011, section 34163 has precluded redevelopment agencies from incurring any new contracts by providing that "an agency shall not have the authority to, and shall not, do any of the following: [¶] . . . [¶] (b) Enter into contracts with, incur obligations, or make commitments to, any entity, whether governmental, tribal, or private, or any individual or groups of individuals for any purpose, including, but not limited to, loan agreements, passthrough agreements, regulatory agreements, services contracts, leases, disposition and development agreements, joint exercise of powers agreements, contracts for the purchase of capital equipment, agreements for redevelopment activities, including, but not limited to, agreements for planning, design, redesign, development, demolition, alteration, construction, reconstruction, rehabilitation, site remediation, site development or improvement, removal of graffiti, land clearance, and seismic retrofits." (See Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 6, eff. June 29, 2011.)

Also part of the legislation enacted by Assembly Bill 1x 26, subdivision (a) of section 34167 provides: "This part is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection

26

services and schools. It is the intent of the Legislature that redevelopment agencies take no actions that would further deplete the corpus of the agencies' funds regardless of their original source. All provisions of this part shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." (Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 6, eff. June 29, 2011.)

And effective June 27, 2012, Assembly Bill 1484 "added new section 34177.3, providing in part as follows: [¶] '(a) Successor agencies shall lack the authority to, and shall not, create new enforceable obligations . . . *or begin new redevelopment work*, except in compliance with an enforceable obligation that existed prior to June 28, 2011 [(i.e., before the effective date of Assembly Bill 1X 26)]. [¶] . . . [¶] (d) . . . Any actions taken by redevelopment agencies to create obligations after June 27, 2011, are ultra vires and do not create enforceable obligations." (*City of Emeryville*, *supra*, 233 Cal.App.4th at pp. 299-301, italics added.)

## C.

### *Unencumbered Balances Held in the Asset Fund*

Cuenca does not dispute the Legislature has eliminated tax increment funding for new redevelopment projects. Cuenca also does not deny $33.2 million held in the Asset Fund and deemed unencumbered by DOF is not subject to any construction contract or pledge for construction loans. Instead, Cuenca argues the Dissolution Law's elimination of the tax increment only "affects [the California Redevelopment Law], not judgments." Pointing out the same difference in property values before and after establishment of the Santa Ana Redevelopment Agency still exists, Cuenca asserts these funds must still be available to fulfill the terms of the stipulated judgments. We disagree.

Cuenca essentially argues the Dissolution Law's provision for the enforceability of the stipulated judgments also safeguards the moneys collected under the judgments from the "claw-back" provisions of the Dissolution Law. In considering this argument, " 'we are mindful that "all intendments favor the exercise of the Legislature's plenary authority:

27

'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action.  Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' " ' (*Matosantos I, supra*, 53 Cal.4th at p. 253; see *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)" (*City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619, 628 (*City of Azusa*).)

Nothing in the stipulated judgments purports to prevent the Legislature from recapturing unspent tax increment funds by subsequent legislation.  Moreover, the stipulated judgments could not have prevented subsequent legislation from reclaiming unencumbered tax increment funds.  The United States Supreme Court has explained that "just as the adopting court is free to reject agreed-upon terms as not in furtherance of statutory objectives, so must it be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. . . . *The parties have no power to require of the court continuing enforcement of rights the statute no longer gives*." (*System Federation No. 91, Ry. Emp. Dept. v. Wright* (1961) 364 U.S. 642, 651-652 [5 L.Ed.2d 349] italics added.)  California case law likewise recognizes that "a consent decree mandating future compliance with a statutory obligation does not invest the parties thereto with a contractual right to demand continued performance in the event that the underlying statutory obligation is changed." (*Welfare Rights v. Frank* (1994) 25 Cal.App.4th 415, 423 (*Welfare Rights*).)

The Dissolution Law unequivocally provides unencumbered moneys originally collected for redevelopment projects must be remitted to the county auditor-controller. (§ 34177, subd. (d).)  As this court has previously explained, "the Legislature wanted to divert *all* RDA assets, while specifying which RDA *obligations* remained enforceable." (*City of Azusa*, *supra*, 238 Cal.App.4th at p. 627.)  Here, the enforceable obligation is the requirement that a percentage of the tax increment be set aside.  Once set aside, the tax increment moneys previously held in the Housing Fund and currently in the Asset Fund

are unencumbered unless subject to specific and enforceable agreements such as contracts for construction or pledges for construction loans. If the moneys are unencumbered, they are subject to the Dissolution Law's requirement they be remitted to the county auditor-controller. (§ 34177.) For this reason, the trial court correctly affirmed DOF's determination approximately $33 million of unencumbered funds held in the Asset Fund must be remitted to the county auditor-controller.

## V

### *Contract Clause Claims*

Cuenca argues transferring moneys from the Asset Fund to the county auditor-controller for transfer to the taxing entities violates the contract clauses of the United States and California Constitutions. Cuenca reasons the stipulated judgments are valid contracts the Legislature may not undermine. We reject the argument.

### A.

### *Impairment of Vested Contractual Rights*

In *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, this court explained: "The contract clauses of the federal and state Constitutions limit the power of a state to modify its own contracts with other parties, as well as contracts between other parties. (*Allen v. Board of Administration* (1983) 34 Cal.3d 114, 119; *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 783.) 'The state occupies a unique position in the field of contract law because it is a sovereign power. This gives rise to general principles which may limit whether an impairment has [occurred] as a matter of constitutional law. First, "[a]n attempt must be made to 'reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power". . . .' " [Citation.] "Not every change in a retirement law constitutes an impairment of the obligations of contract, however. [Citation.] Nor does every impairment run afoul of the contract clause." [Citation.] " 'The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their "just and

29

reasonable purport"; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. [Citations.] The Contract Clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains reasonably to be expected from the contract."''''" (*California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 510–511 [state's reduction of contributions to teachers' retirement system was unconstitutional impairment of contract].) [¶] 'Our analysis requires a two-step inquiry into: (1) the nature and extent of any contractual obligation . . . and (2) the scope of the Legislature's power to modify any such obligation.' (*Valdes v. Cory, supra*, 139 Cal.App.3d at p. 785.)" (*Board of Administration v. Wilson*, *supra*, at pp. 1130-1131, fn. omitted.)

Regarding the first step of the inquiry about the nature and extent of any contractual obligation, we find instructive the case of *Welfare Rights*, *supra*, 25 Cal.App.4th 415. *Welfare Rights* involved an action to enforce a previously entered consent decree in which Humboldt County agreed to "set general assistance grant levels at $376 per month, which was equal to the $326 grant level for Aid to Families with Dependent Children (AFDC) plus $50. The agreement provided that the grant level would 'increase annually according to the AFDC MBSAC Annual [cost of living adjustment] [plus] $50.'" (*Id.* at p. 418.) The trial court approved the consent decree and retained jurisdiction to enforce its terms. (*Ibid.*) Two years later, the Legislature enacted Welfare and Institutions Code section 17000.5 that allowed counties to "discharge their general assistance obligations by setting grant levels at 62 percent of a guideline that is equal to the 1991 federal official poverty line and by annually adjusting that guideline by the amount of any adjustment provided under the AFDC program." (*Id.* at pp. 418-419.) "Significantly, however, subdivision (c) of [Welfare and Institutions Code] section

30

17000.5 specifically exempted counties under 'preexisting settlements.' " (*Id.* at p. 419.) This exemption for preexisting agreements was repealed a year later. (*Ibid.*) Humboldt County then began setting its general assistance grant levels based on the statutory formula instead of the formula specified in the earlier consent decree. (*Id.* at pp. 419-420.) Plaintiffs sued Humboldt County on grounds the repeal of the exemption for preexisting agreements violated the contract clauses of the California and United States Constitutions. (*Id.* at pp. 419-420.)

The trial court in *Welfare Rights* agreed with plaintiffs that the repeal of the exemption for preexisting agreements unconstitutionally impaired the obligation in the consent decree. (25 Cal.App.4th at p. 420.) The Court of Appeal reversed, and explained: "The contract clauses of the state and federal Constitutions protect only *vested contractual rights*. (*Legislature v. Eu* (1991) 54 Cal.3d 492, 528, 534.) Contrary to plaintiffs' assertion, a consent decree mandating future compliance with a statutory obligation does not invest the parties thereto with a contractual right to demand continued performance in the event that the underlying statutory obligation is changed." (*Welfare Rights*, *supra*, at p. 423.)

The *Welfare Rights* court articulated a second rationale for its holding in that "[n]othing in the Consent Decree purports to give plaintiffs a vested contractual right to continue to have their general assistance grant levels set according to the formula specified in the decree in the event the underlying statutory obligation to provide for the 'minimum subsistence needs' of general assistance recipients is changed, as happened here. Since no vested contractual rights are involved, the contract clause protections of the state and federal Constitutions are simply not implicated." (25 Cal.App.4th at p. 424, fn. omitted.)

Similarly, *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193 involved a motion to enforce an earlier stipulated judgment after the County of Los Angeles decided to follow the subsequently enacted statutory formula in Welfare and Institutions

31

Code section 17000.5. (*Id.* at pp. 1198-1199.) The *Mendly* court rejected a contract clause challenge on grounds the "instant stipulated judgment does not constitute a 'contract' for purposes of contract clause analysis." (*Id.* at p. 1205.) *Mendly* explained, "Although the instant judgment was based upon the parties' settlement agreement, the settlement occurred within a case seeking injunctive and declaratory relief. 'It is settled that where there has been a change in the controlling facts upon which a permanent injunction was granted, or the law has been changed, modified or extended, or where the ends of justice would be served by modification or dissolution, the court has the inherent power to vacate or modify an injunction where the circumstances and situation of the parties have so changed as to render such action just and equitable. [Citations.] This principle governs even though the judgment providing the injunctive relief is predicated upon stipulation of the parties.' " (*Mendly*, at pp. 1206-1207, quoting *Welsch v. Goswick* (1982) 130 Cal.App.3d 398, 404–405.)

## B.

### *The Stipulated Judgments Did Not Provide Vested Rights to Use of the Tax Increment*

The Legislature's elimination of the tax increment and requirement to remit unencumbered tax increment moneys to the taxing entities under section 34177 did not violate the contracts clauses of the United States and California Constitutions. The reasoning of *Welfare Rights* and *Mendly* applies here where the stipulated judgments are also not subject to contracts clause challenges. Even though the stipulated judgments in this case were entered upon agreement of the parties, none of the parties could bind the Legislature to continued authorization of tax increment spending for redevelopment projects. Because the stipulated judgments incorporated no vested right to receipt or disposition of tax levies, we reject Cuenca's argument under the contracts clauses. The five stipulated judgments did not provide any vested contractual right to receive or retain tax increment moneys. The five stipulated judgments did not include terms requiring an amount of the tax increment to be collected or to disallow unspent moneys from being

32

legislatively reallocated. Instead, the five stipulated judgments required only that certain specified percentages of the tax increment moneys received be set aside for low- and moderate-income housing in Santa Ana. Consequently, the Dissolution Law's elimination of the tax increment and requirement to remit unencumbered moneys in the Asset Fund to the county auditor-controller do not violate the contracts clauses of the federal and state constitutions.

## VI

### *Cuenca's Challenge under Propositions 1A and 22*

Cuenca next argues requiring the housing successor to remit Asset Fund moneys to the county auditor-controller violates Proposition 1A and Proposition 22. We disagree.

### A.

### *Cognizability*

Respondents assert this issue has not been preserved for appeal because Cuenca did not present this argument in the trial court. Generally, we do not consider issues raised for the first time on appeal. (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 191.) However, Cuenca did present the issues in the trial court by arguing Propositions 1A and 22 prevented DOF from ordering the City to remit moneys from the Asset Fund to the county auditor-controller. Cuenca preserved the issues by raising the same challenges under Propositions 1A and 22 in the trial court before advancing them on appeal. Accordingly, we consider the issues on the merits.

### B.

### *Proposition 1A*

In *City of Cerritos v. State*, *supra*, 239 Cal.App.4th 1020, this court considered challenges to the Dissolution Law under seven different provisions of the California Constitution, including article XIII, section 25.5, subdivision (a)(3), Proposition 1A.

33

(*City of Cerritos v. State*, at pp. 1027, 1030.)  The central argument in *City of Cerritos v. State* was that "Assembly Bill 1X 26 violates Proposition 1A, which the electorate approved at the general election in November 2004.  (Stats. 2004, res. ch. 133.)  Proposition 1A added Article XIII, section 25.5(a)(3) to the state Constitution.  ([*California Redevelopment Assn. v. Matosantos* (2013)] 212 Cal.App.4th [1457,] 1467.)  That section generally 'prohibits the Legislature from raiding local property tax allocations to help balance the budget.'  (*Ibid*.)"  (*City of Cerritos v. State*, *supra*, at pp. 1033-1034.)

The plaintiffs in *City of Cerritos v. State* argued the Dissolution Law reallocated the tax increment in a manner that would have required approval of a two-thirds majority of the Legislature.  (239 Cal.App.4th at p. 1034.)  This court rejected the argument and explained, "Assembly Bill 1X 26 reallocates to successor agencies, which are not local agencies within the meaning of Proposition 1A, the property tax revenues that would have gone to redevelopment agencies had they not been dissolved in order to satisfy indebtedness previously incurred under Article XVI, section 16.3 (Assem. Bill 1X 26, § 1, subds. (i), (j)(2); § 34172, subds. (c) ['Solely for purposes of Section 16 of Article XVI of the California Constitution, the Redevelopment Property Tax Trust Fund shall be deemed to be a special fund of the dissolved redevelopment agency. . . .'] & (d) ['Revenues equivalent to those that would have been allocated pursuant to subdivision (b) of Section 16 of Article XVI of the California Constitution shall be allocated to the Redevelopment Property Tax Trust Fund of each successor agency for making payments on the principal of and interest on loans, and moneys advanced to or indebtedness incurred by the dissolved redevelopment agencies.  Amounts in excess of those necessary to pay obligations of the former redevelopment agency shall be deemed to be property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIII A of the California Constitution'].)  Once such obligations are satisfied, any excess revenues are then allocated to local agencies according to their Assembly Bill

No. 8 (1977-1978 Reg. Sess.) allocations.  (§§ 34172, subd. (d); 34188, subd. (a)(1).)  *Thus, rather than take funds away from local agencies, which Proposition 1A was intended to halt, Assembly Bill 1X 26 provides local agencies with more money than they otherwise would have received.*" (*City of Cerritos v. State*, at p. 1041, italics added; fn. omitted.)

As *City of Cerritos v. State* explains, "Local agencies have no vested right to a certain *amount* of property taxes.  (*Matosantos I, supra*, 53 Cal.4th at p. 245.)  Nothing in Proposition 1A changes that.  Proposition 1A simply protects an agency's pro rata *share* of property taxes.  Because Assembly Bill 1X 26 does not change the pro rata shares of local agency property tax allocations, it does not run afoul of Proposition 1A." (*City of Cerritos v. State*, *supra*, 239 Cal.App.4th at p. 1042.)  This holding also applies to Cuenca's challenge under Proposition 1A because the housing successor has no vested right to retain unencumbered moneys held in the Asset Fund.  Consequently, the Dissolution Law does not violate Proposition 1A by requiring unencumbered moneys to be remitted to the county auditor-controller.

## C.

### *Proposition 22*

Cuenca contends the Dissolution Law violates Proposition 22 by requiring that unencumbered moneys collected under the stipulated judgments and held in the Asset Fund must be remitted to the county auditor-controller.

This court has previously determined that "[t]he Supreme Court has already found that Assembly Bill 1X 26 did not violate . . . Proposition 22, which added Article XIII, section 25.5, subdivision (a)(7)." (*City of Cerritos v. State*, *supra*, at p. 1038, fn. 2, citing *Matosantos I, supra*, 53 Cal.4th at pp. 241–242.)  The petitioners in *Matosantos I* argued the Dissolution Law violated Proposition 22, "which amended the state Constitution to place limits on the state's ability to require payments from redevelopment agencies for the state's benefit.  (See Cal. Const., art. XIII, § 25.5,

35

subd. (a)(7), added by Prop. 22, as approved by voters, Gen. Elec. (Nov. 2, 2010).)" (*Matosantos I*, at p. 241.)

"Proposition 22 expressly adds numerous limits to the Legislature's statutory powers (Prop. 22, Gen. Elec. (Nov. 2, 2010) §§ 3–5, 5.3, 6–6.1, 7), and in one instance withdraws from the Legislature a preexisting constitutional power (*id*., § 5.6 [repealing Cal. Const., art. XIX, former § 6]), but makes no mention of any intent to divest the Legislature of the power to dissolve redevelopment agencies. If the initiative proponents and voters had intended to strip the Legislature of that power or to alter the Legislature's article XVI, section 16 permissive authority, it stands to reason they would have said so expressly." (*Matosantos I, supra*, 53 Cal.4th at p. 261.)

However, "Proposition 22's limit on state restrictions of redevelopment agencies' use of their funds is best read as limiting the Legislature's powers during the operation, rather than the dissolution, of redevelopment agencies. Article XIII, section 25.5, subdivision (a)(7)(B) prohibits, with minor exceptions, further legislative restrictions on the use of property taxes allocated to redevelopment agencies under article XVI, section 16. Article XVI, section 16, in turn, creates no absolute right to an allocation of property taxes. (See Cal. Const., art. XVI, § 16 ['The Legislature *may* provide that any redevelopment plan *may* contain a provision' diverting tax increment to redevelopment agencies (italics added)].) Thus, *if* the Legislature exercises its constitutional power to authorize allocation of property taxes to redevelopment agencies, and *if* a redevelopment plan so provides, *then* those taxes so allocated to an operating redevelopment agency may not be restricted to benefit the state by further legislative action.

"The Legislature in fact exercised that constitutional power when adopting and subsequently amending the Community Redevelopment Law (see §§ 33670, 33675), but the right of redevelopment agencies to tax increment funding thereby created was statutory, not constitutional. In turn, Assembly Bill 1X 26 revises those statutory rights. The Legislature has determined that tax increment should no longer be allocated to

36

redevelopment agencies (Assem. Bill 1X 26, § 1, subd. (i) [upon agencies' dissolution, property taxes are no longer to be deemed tax increment and allocated to redevelopment agencies]), except insofar as necessary to satisfy existing obligations. The measure exercises the Legislature's constitutional power to authorize property tax increment revenue for, or to withdraw that authorization from, redevelopment agencies. (See Cal. Const., art. XVI, § 16.) As such, the measure modifies the constitutional predicate for the operation of article XIII, section 25.5, subdivision (a)(7)(B) of the state Constitution. In the absence of property tax increment allocated under article XVI, the latter subdivision has no force or effect." (*Matosantos I, supra*, 53 Cal.4th at p. 263.)

Cuenca attempts to distinguish *Matosantos I* on grounds the California Supreme Court's decision was issued six months before the Legislature enacted the statute that unencumbered moneys held in Asset Funds must be remitted to the county auditor-controller. (Compare *Matosantos I, supra,* 53 Cal.4th 231 [decided Dec. 29, 2011] with (§ 34179.6, subd. (f) [added by Stats. 2012, ch. 26, § 18, eff. June 27, 2012].) Regardless of timing, the reasoning articulated in *Matosantos I* applies to the analysis of whether section 34179.6 violates Proposition 22. As the California Supreme Court explained, "Redevelopment agencies . . . *have a conditional right to the tax increment only to the extent of any existing indebtedness*. (§§ 33670, 33675; Cal. Const., art. XVI, § 16, subd. (b); cf. *Marek v. Napa Community Redevelopment Agency* [(1988)] 46 Cal.3d [1070,] 1082 [interpreting 'indebtedness' to include all existing obligations, including executory ones].) They have no particular right to incur additional future indebtedness. The provisions of part 1.8 of division 24 of the Health and Safety Code, which respect the need to satisfy existing indebtedness (see § 34167) while precluding the creation of additional indebtedness (§§ 34162–34163), invade no rights protected by article XIII, section 25.5, subdivision (a)(7)(B) of the state Constitution." (*Matosantos I, supra*, 53 Cal.4th at p. 264, italics added.) In short, Proposition 22 does not prohibit section 34167's provision that requiring unencumbered moneys held in Asset Funds to be

remitted to the county auditor-controller because the dissolution of the redevelopment agencies also eliminated their claims to unencumbered moneys.

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (5).)


                                                            /s/
                                                    HOCH, J.



We concur:


        /s/
NICHOLSON, Acting P.J.


        /s/
DUARTE, J.