Filed 12/29/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| LEGAL AID SOCIETY OF SAN MATEO COUNTY,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF FINANCE et al.,<br>        Defendants and Respondents;<br><br>CITY OF REDWOOD CITY et al.,<br>        Real Parties in Interest and Respondents. | C076428<br><br>(Super. Ct. No. 34201380001449CUWMGDS) |
| CITY OF REDWOOD CITY et al.,<br>        Plaintiff and Appellants,<br><br>    v.<br><br>KEELY M. BOSLER, as Director, etc., et al.,<br>        Defendants and Respondents.<br><br>LEGAL AID SOCIETY OF SAN MATEO COUNTY,<br>        Real Party in Interest and Respondent. | C076431<br><br>(Super. Ct. No. 34201380001447CUWMGDS) |

1

APPEALS from judgments of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Reversed with directions.

Western Center on Law & Poverty, S. Lynn Martinez and Richard A. Rothschild; Public Interest Law Project, Deborah Collins, Michael Rawson and Valerie Feldman for Plaintiff and Appellant in Case No. C076428 and Real Party in Interest and Respondent in Case No. C076431 Legal Aid Society of San Mateo County.

Kerr & Wagstaffe, Wagstaffe von Loewenfeldt, Busch & Radwick, James M. Wagstaffe, Michael von Loewenfeldt; Best Best & Krieger, Iris P. Yang and Sigrid K. Asmundson for Real Parties in Interest and Respondents in Case No. C076428 and Plaintiffs and Appellants in Case No. C076431 City of Redwood City of Redwood City as Housing Successor, and the Successor Agency to the Redevelopment Agency of the City of Redwood City.

John C. Beiers, County Counsel, Paul A. Okada, Chief Deputy County Counsel and Justin W. Mates, Deputy County Counsel, for Defendant and Respondent Juan Raigoza, Controller of the County of San Mateo.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods, Assistant Attorney General, Mark Beckington and Jonathan M. Eisenberg, Deputy Attorneys General, for Defendants and Respondents Department of Finance.

In 1990, as the result of a dispute involving concerns about affordable housing for clients of plaintiff Legal Aid Society of San Mateo County (LAS), plaintiff City of Redwood City (Redwood City), the former redevelopment agency (RDA) formed by Redwood City, and LAS entered into an agreement. Pursuant to the agreement, the former RDA agreed to deposit $11,917,200 in tax increment funds into the Low and Moderate Income Housing Fund (LMI Housing Fund) (see generally Health & Saf. Code, § 33334.3) it maintained pursuant to the requirements of the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq. (CRL)) to be used as housing funds consistent with the CRL.[1]

---

[1] Undesignated statutory references are to the Health and Safety Code.

2

In 2011, faced with a state fiscal emergency, the Legislature enacted the Dissolution Law, dissolving RDAs, eliminating tax increment financing, and transferring property taxes, including unencumbered funds in Low and Moderate Income Housing Funds, back to local governments and schools. Following the enactment of the Dissolution Law, plaintiffs' position was that the $10,272,916 then on deposit in the LMI Housing Fund specifically attributable to the 1990 agreement constituted an encumbered housing asset and thus was not subject to remit to the county auditor-controller. However, defendant Department of Finance (DOF) concluded that these funds were unencumbered and directed the funds be remitted.

Plaintiffs each filed writ petitions and complaints against DOF asserting that the funds were encumbered assets under the 1990 agreement and various provisions of the Dissolution Law and the CRL. The trial court denied the petitions, concluding that the subject funds were unencumbered, were not enforceable obligations within the meaning of the Dissolution Law, and were available for distribution to the local taxing entities. Plaintiffs separately appealed and we granted plaintiffs' motion to consolidate the appeals.

On appeal, plaintiffs assert: (1) the 1990 agreement constituted an enforceable obligation, which is defined in section 34171, subdivision (d)(1)(E) as "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy," and (2) the $10,272,916 on deposit pursuant to the agreement could not be transferred to the taxing entities because the funds "are legally restricted as to purpose" within the meaning of section 34179.5, subdivision (c)(5)(B) and "are legally or contractually dedicated or restricted for the funding of an enforceable obligation" within the meaning of section 34179.5, subdivision (c)(5)(D).

We agree with plaintiffs and reverse.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### The 1990 Agreement

According to plaintiffs, in or around 1982, Redwood City and its RDA created the Redevelopment Project No. 2 Project Area (the Project Area). In a validation action, LAS challenged the plan on behalf of lower income clients. In 1984 the parties settled. Part of the settlement required the RDA to target 35 percent of its Low and Moderate Housing Fund for housing for very low income households. In or around 1985, a first amendment to the Project Area was adopted, and in or around 1990, a second amendment to the Project Area was adopted.

LAS raised concerns that its affordable housing clientele could experience hardships as a result of the implementation of the second amendment to the Project Area. Redwood City, the RDA, and LAS entered into the "Agreement Between the Redevelopment Agency of the City of Redwood City, the City of Redwood City and [LAS], Concerning Amendment No. 2 of Redwood City Redevelopment Project No. 2" (the Agreement). Among its recitals, the Agreement stated: "By means of this Agreement, the parties have achieved an accommodation between the objectives of the Amended Redevelopment Plan for the Amendment Area and the objectives sought by [LAS] on behalf of its clients who need affordable housing." The RDA agreed to deposit $11,917,200 in tax increment funds into its LMI Housing Fund.[2] These funds were to be "maintained and disbursed in accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL], as the same may from time to time be

---

[2] According to LAS, in 2004, the RDA unilaterally "reinterpreted" the Agreement in such a way that had the effect of reducing the amount of the settlement funds paid by the RDA. LAS objected, challenging the RDA's reinterpretation of the Agreement. In 2008, the dispute was settled and the RDA restored the deposit. LAS asserts that approximately $1.6 million is still owed, although it does not claim a right to that additional amount in this action.

amended." The Agreement further stated that the RDA "shall have no duty to segregate or maintain any sort of separate fund for any of the sums deposited in the Housing Fund pursuant to this Agreement."[3]

### The Dissolution Law and Relevant Background

"In 1945, the Legislature authorized cities and counties to form community redevelopment agencies to address issues of urban decay in California. [Citations.] In 1951, the Legislature renamed the statutory scheme as the Community Redevelopment Law (CRL) and codified it at section 33000 et seq. [Citations.] 'The Community Redevelopment Law "was intended to help local governments revitalize blighted communities." ' [Citations.] Included in the aim of the CRL was the goal 'to increase the supply of low- and moderate-income housing.' " (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 209 (*Cuenca*).)

RDAs generally could not levy taxes, and, instead relied on tax increment financing. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246 (*Matosantos*).) "Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school

---

[3] Plaintiffs maintain that the funds to be deposited into the LMI Housing Fund pursuant to the Agreement were to be in addition to the statutorily mandated default 20 percent minimum set-aside that was to be deposited into that fund. (See §§ 33334.2, subd. (a), 33334.3, 33334.6, subd. (c).) DOF asserts that, in calling for the deposits to the LMI Housing Fund, the Agreement "did *not* deviate from or supplement the CRL by making the . . . RDA deposit into the [LMI Housing Fund] more than 20 percent of the tax-increment money allocated to the . . . RDA," and that "[b]y complying with the [Agreement], the . . . RDA was truly and merely just complying with then-existing statutory law in terms of the amount of money set aside." Thus, it appears that DOF's position is that, while the funds deposited pursuant to the Agreement may have been in excess of the minimum 20 percent, in making these deposits, the RDA was doing no more than what the CRL required: depositing *at least* 20 percent of the taxes allocated to the RDA pursuant to sections 33334.2, subdivision (a), and 33334.6, subdivision (c) into that fund.

5

districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project. [Citations.] In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from any increase in value is awarded to the redevelopment agency on the theory that the increase is the result of redevelopment." (*Id*. at pp. 246-247.)

"To ensure that redevelopment agencies focus attention on creating affordable housing, the Legislature . . . mandated that 20 percent of the tax increment received by a redevelopment agency be set aside in a separate housing fund to be spent exclusively to improve and increase affordable housing opportunities." (*Craig v. City of Poway* (1994) 28 Cal.App.4th 319, 325, citing §§ 33334.2 & 33334.3; see also §§ 33334.6, subd. (c), 33670.) "The funds that are required by Section 33334.2 or 33334.6 to be used for the purposes of increasing, improving, and preserving the community's supply of low- and moderate-income housing shall be held in a separate [LMI Housing Fund] until used." (§ 33334.3, subd. (a).)

In 2011, to address a state fiscal crisis, the Legislature enacted Assembly Bill No. 26 (Assem. Bill No. 1X 26 (2011-2012 1st Ex. Sess.) ch. 5 (AB 1X 26)) to effect the dissolution of the RDAs, the elimination of the tax increment, and the transfer of property taxes back to local governments and schools. (*City of Montclair v. Cohen* (2018) 20 Cal.App.5th 238, 244; *Cuenca, supra*, 8 Cal.App.5th at p. 207.) "As described by our high court in *Matosantos*, Assembly Bill No. 1X 26 consisted of two principal components, codified in two new parts of the Health and Safety Code. Part 1.8 was the 'freeze' provision, effective immediately upon gubernatorial signature on June 28, 2011, and part 1.85 was the 'dissolution component.' [Citation.] The latter did not become operative until after the decision in *Matosantos*, which lifted a judicial stay of part 1.85

6

and reformed its effective date to February 1, 2012." (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 573-574 (*Grass Valley*).)

As stated in section 34167, part 1.8, the freeze component, "is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection services and schools. It is the intent of the Legislature that redevelopment agencies take no actions that would further deplete the corpus of the agencies' funds regardless of their original source. All provisions of this part shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." (§ 34167, subd. (a).)

While the freeze component froze RDA assets and prohibited RDAs from entering into new business (§ 34163), it did allow RDAs to continue to make payments on and perform what it referred to as "enforceable obligations" until successor agencies were authorized pursuant to part 1.85. (§ 34169.) Enforceable obligations were defined, for purposes of part 1.8, in sections 34167, subdivision (d) and 34171, subdivision (d)(1)(E), to include "[*a*]*ny* legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (Italics added.)

Section 34167.5, effective June 29, 2011, provided, in pertinent part, "the Controller shall review the activities of redevelopment agencies in the state to determine whether an asset transfer has occurred after January 1, 2011, between the city or county, or city and county that created a redevelopment agency or any other public agency, and the redevelopment agency. If such an asset transfer did occur during that period and the government agency that received the assets is not contractually committed to a third party for the expenditure or encumbrance of those assets, to the extent not prohibited by state and federal law, the Controller shall order the available assets to be returned to the

7

redevelopment agency or, on or after October 1, 2011, to the successor agency, if a successor agency is established pursuant to Part 1.85 (commencing with Section 34170)."

As stated *ante*, the dissolution component, part 1.85, became operative on February 1, 2012. (§ 34170, subd. (a); *Matosantos, supra*, 53 Cal.4th at pp. 274-276.) It dissolved all RDAs and provided for the transfer of control of RDA assets to successor agencies. (§§ 34171, subd. (j), 34173, 34175, subd. (b).) The dissolution component required successor agencies to remit all unencumbered balances of RDA funds to the county auditor-controller for distribution to other local taxing agencies. (§§ 34177, subd. (d), 34183, subd. (a)(4), 34188.) It also required successor agencies to continue to make payments on and "perform obligations required pursuant to enforceable obligations." (§ 34177, subd. (a) & (c).)

Under the dissolution component, successor agencies were required to submit Recognized Obligation Payment Schedules (ROPS) "setting forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period . . . ." (§ 34171, subd. (h).) The ROPS are to be approved by the oversight board (§ 34180, subd. (g)), and then submitted to DOF, which approves or disapproves of the listed items. (§ 34177, subds. (a), (*l*)(2); *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 808; *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1433, fn. 2 (*Petaluma*).)

In June 2012, the Legislature enacted Assembly Bill No. 1484 (AB 1484) as " 'clean-up' legislation to AB 1X 26. (Assem. Bill No. 1484 (2011-2012 Reg. Sess.); Stats. 2012, ch. 26)." (*Petaluma, supra*, 238 Cal.App.4th at p. 1434, fn. 4.) Together AB 1X 26 and AB 1484 are referred to as the Dissolution Law. (*Petaluma*, at p. 1434, fn. 4.)

Section 34179.5, added by AB 1484 and effective June 27, 2012, mandates "an audit of successor agencies to determine whether unobligated tax increment revenues were available for transfer to taxing entities. [Citations.] This due diligence review

8

(DDR) [citation] identified '[t]he dollar value of assets and cash . . . transferred after January 1, 2011, through June 30, 2012, by the redevelopment agency or the successor agency to [a sponsoring entity] and the purpose of each transfer.' [Citation.] Assembly Bill No. 1484 required the successor agency to submit the results of this audit to the successor agency's oversight board [citation] and to the [DOF], which had the authority to adjust any amounts in the DDR." (*Grass Valley, supra*, 17 Cal.App.5th at p. 574.)

### Case-Related Developments Following the Enactment of the Dissolution Law

Redwood City passed a resolution providing that it would serve as successor agency to its RDA and that it would retain the housing assets and functions previously held and performed by the RDA. Redwood City, as housing successor, prepared a housing asset transfer form stating all of the former RDA's housing assets were transferred to it as housing successor on or after February 1, 2012 and deposited into the legislatively created new fund under section 34176, subdivision (d), called the Low and Moderate Income Housing Asset Fund (LMI Housing Asset Fund).[4]

At the time of the housing asset transfer, the amount attributable to the Agreement was $10,272,916. This asset was listed on Redwood City's housing asset transfer form pursuant to section 34176, subdivision (a)(2).

In a letter dated August 31, 2012, DOF objected to this line item of the housing asset transfer form, stating that section "34176 (e) (2) allows for transfer of funds that are encumbered for an enforceable obligation to build or acquire low and moderate income housing. The supporting documents provided do not state a specific scope for this contract." Redwood City submitted a request to meet and confer with DOF. It asserted

---

**4** With one exception not relevant here, section 34176, subdivision (d), requires that "any funds transferred to the housing successor, together with any funds generated from housing assets . . . shall be maintained in a separate [LMI] Housing Asset Fund which is hereby created in the accounts of the housing successor." (See generally § 34176.1.)

9

that the Agreement funds were encumbered assets of the former RDA's LMI Housing Fund which were transferred to Redwood City as housing successor. Redwood City asserted: "The [Agreement] Funds represent funds deposited into the [LMI Housing Fund] by the former RDA as required under the . . . Agreement. Specifically, the . . . Agreement required the former RDA to maintain and disburse the funds deposited into the [LMI Housing Fund] only as allowed for housing funds of redevelopment agencies pursuant to the [CRL]. Accordingly, these funds are expressly restricted and encumbered for affordable housing purposes within Redwood City." Redwood City as housing successor submitted another request to meet and confer, setting forth the same arguments as the prior meet and confer request.

A letter from DOF dated December 27, 2012, stated that it superseded the August 31, 2012, letter. DOF continued to object, stating: section "34176 (e) (2) allows the housing successor entity to recognize encumbrances for housing related enforceable obligations so that they can be placed on future ROPS. The purpose of the . . . [A]greement was to ensure that the designated housing fund be used for the development, acquisition, or preservation of affordable housing. However, the . . . [A]greement does not require specific contracts be executed, and without a binding contract for a specific purpose, an enforceable obligation doesn't exist. Furthermore, . . . section 34179.5 (c) (5) (B) and (D) required the DDR to identify funds that are legally restricted or contractually dedicated. [DOF] does not believe the . . . [A]greement contractually dedicates these funds as an enforceable obligation pursuant to" section 34171, subdivision (d).[5]

---

[5] Section 34171, subdivision (d)(1)(E), which appears in part 1.85, is one of several alternative definitions of "[e]nforceable obligation" in subdivision (d). Echoing section 34167, subdivision (d)(5), subdivision (d)(1)(E) of section 34171 provides, that an enforceable obligation includes: "*Any* legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (Italics

10

Relevant to Redwood City's DDR, DOF sent a letter dated December 19, 2012, following a meet and confer session on December 7, 2012, stating that it superseded its letter dated November 7, 2012. DOF continued to maintain the adjustment it made to the DDR was an appropriate exercise of its authority under section 34179.6, subdivision (d). DOF stated that its prior conclusion, made in connection with its review of the housing asset transfer form, that the Agreement failed to satisfy the requirements of section 34176, subdivision (e)(2), was supported by additional review of the Agreement. DOF again noted that the Agreement did not require that specific contracts be executed, and further asserted that, without a binding contract for a specific purpose, an enforceable obligation did not exist. DOF thus maintained that the Agreement did not render the subject funds an enforceable obligation pursuant to section 34171, subdivision (d). DOF further stated that these funds did not appear on any prior ROPS.[6] DOF denied Redwood City's request to retain the funds, and directed that the $10,272,916 be remitted to the county auditor-controller.

### The Pleadings

Redwood City filed a petition for writ of mandate and complaint for injunctive and declaratory relief. Redwood City asserted that the subject funds retained pursuant to the Agreement were "encumbered by the . . . Agreement itself, which requires that the funds be used only for affordable housing purposes." Redwood City asserted the invalidation of the Agreement violated section 34171, subdivision (d)(1)(E), defining enforceable obligations (see fn. 5, *ante*), and that DOF exceeded its authority in requiring it, as housing successor, to remit the subject funds to the county auditor-controller. According

---

added.) In our discussion *post*, we shall refer to section 34171, subdivision (d)(1)(E) instead of section 34167, subdivision (d)(5).

[6] As LAS points out, the subject funds did appear on ROPS I, revised ROPS I, and ROPS II, which were all approved by DOF.

to Redwood City, these funds were a housing asset as that term is used in section 34176, subdivision (e),[7] and they were required to be retained by the housing successor and used for the purposes contemplated by the Agreement, specifically to provide affordable housing for low- and moderate-income households. Redwood City sought a peremptory writ of mandate compelling DOF to recognize the Agreement as an enforceable obligation and the money retained in connection with the Agreement as a housing asset to be retained by the housing successor.

LAS also filed a petition for a writ of mandate and complaint for injunctive and declaratory relief, largely duplicating the factual allegations in Redwood City's petition and complaint. LAS asserted that, if Redwood City remitted the subject funds to the auditor-controller, it would be in violation of the Agreement. LAS sought a peremptory writ of mandate and/or injunctive relief, compelling DOF to recognize the Agreement as an enforceable obligation pursuant to section 34171, subdivision (d), and a housing asset pursuant to section 34176, subdivision (e), and to approve of the withholding of those funds as encumbered funds pursuant to sections 34179.5 and 34179.6.

The two cases were ordered related pursuant to California Rules of Court, rule 3.300(h)(1).

**Hearing in the Trial Court**

At a hearing on the petitions, Redwood City asserted that the subject funds "cannot be characterized as if they were unencumbered simply because there were no contracts in place to use them at the time the Dissolution Act was enacted and signed into law." The trial court noted that there was no contract for a specific development project,

---

[7] Section 34176, subdivision (e)(2), defines "housing asset" which can be retained by the housing successor to include: "Any funds that are *encumbered by an enforceable obligation* to build or acquire low- and moderate-income housing, as defined by the [CRL] (Part 1 (commencing with Section 33000)) unless required in the bond covenants to be used for repayment purposes of the bond." (Italics added.)

and that the money was "in the fund to be used pursuant to the redevelopment law." The trial court stated that it interpreted the Agreement as stating that the money would be put into the fund for use under the redevelopment law, "and then the Legislature comes along and changes the redevelopment law." Redwood City pointed out that, in the Dissolution Law, the Legislature did not change "how money in housing funds were to be used." Redwood City asserted that the funds contemplated by the Agreement were "encumbered by an enforceable obligation" within the meaning of section 34176, subdivision (e)(2), "because it meets the definition that's set forth in [section] 34171 (d)(1)(E)." Redwood City asserted that DOF's position was that, "even if there is such an enforceable obligation in the . . . [A]greement that you still need another enforceable obligation that would specifically address the use of those [LAS] funds." Redwood City maintained that this was not consistent with the requirements of the Dissolution Law. Redwood City further asserted that the Dissolution Law "did not amend the various affordable housing provisions that are in the [CRL] itself." Redwood City described its position: "by virtue of the . . . [A]greement, that those funds are encumbered much as they would be if there were housing bond proceeds, or if there were grant funds that specify that the money can only be used for affordable housing purposes. And the DDR provisions in [section] 34179.5 recognized that."

In addition to reiterating a number of Redwood City's contentions, LAS relied on the DDR procedure in section 34179.5, specifically its requirement of a separate accounting "for the balance for the [LMI] Housing Fund for all other funds and accounts combined," including an "itemized statement listing any amounts that are *legally restricted as to purpose* and cannot be provided to taxing entities. This could include the proceeds of any bonds, grant funds, or funds provided by other governmental entities that place conditions on their use." (§ 34179.5, subd. (c)(5)(B).) LAS asserted that the Agreement indeed restricted the subject funds to the purpose of affordable housing, and further defined what it means by affordable housing by referring to provisions of the

13

CRL. LAS also relied on section 34179.5, subdivision (c)(5)(D), which requires as part of the accounting, "[a]n itemized listing of any current balances that are legally or *contractually dedicated or restricted* for the funding of an enforceable obligation that identifies the nature of the dedication or restriction and the specific enforceable obligation." LAS further asserted that, assuming the Agreement created an enforceable obligation, giving rise to encumbered funds, DOF's interpretation amounted to an unconstitutional impairment of contract.

DOF conceded that the Agreement was a contract, but asserted that it did not give rise to an enforceable obligation under the Dissolution Law. DOF further asserted that its prior approval of the ROPS submitted by Redwood City as successor agency was not inconsistent with the interpretation that the Agreement funds were not an enforceable obligation. DOF asserted, essentially, that money is not encumbered merely because it was in the LMI Housing Fund, and that there could be encumbered money and unencumbered money in that fund. DOF asserted that money in the fund that was committed to a specific project would be an enforceable obligation, and money that was "just sitting there, . . . unspent, uncommitted," would not. DOF asserted that the Agreement "simply says this money will be treated per statute. It's not adding anything beyond the existing statutory obligations which no longer apply to otherwise unencumbered money in a [LMI Housing Fund]. The contract does not add any specific enforceable obligation." While acknowledging the Agreement was a contract, DOF asserted that it did no more than reiterate the statutory law that was to be followed, but now the statutory law had been changed.

**Order and Judgment**

After additional briefing, the trial court affirmed its tentative ruling denying the petitions. The trial court ruled that the subject funds were unencumbered within the meaning of the Dissolution Law, and therefore they were available for distribution to the local taxing entities.

14

First, the court noted section 34176, subdivision (a)(1), which provides that, if a city elects to retain the housing assets and functions previously performed by the RDA, which Redwood City did, "all rights, powers, duties, obligations, and housing assets, as defined in subdivision (e), excluding any amounts on deposit in the [LMI Housing Fund] and enforceable obligations retained by the successor agency, shall be transferred to the city . . . ." (§ 34176, subd. (a)(1).) The trial court concluded that, once deposited in the LMI Housing Fund, the subject funds were " 'amounts on deposit in the Housing Fund' " and "simply bec[a]me part of the Housing Fund." Therefore, according to the court, these funds should not have been transferred to Redwood City, but rather should have remained in the housing fund.

The court was not persuaded by plaintiffs' argument that the subject funds were "housing assets" within the meaning of section 34176, subdivision (e)(2) – " 'funds that are encumbered by an enforceable obligation to build or acquire low- and moderate-income housing' " -- and were thus properly transferred to Redwood City as housing successor pursuant to subdivision (a)(1) of that section. The court stated that, even if Redwood City and LAS were correct that the funds satisfied the definition of a " 'housing asset,' " section 34176, subdivision (a)(1), quoted *ante*, "clearly directs that they *not* be transferred to the City. . ." in light of that subdivision's exclusion of "any amounts on deposit in the" LMI Housing Fund. In a footnote, the trial court further stated: "Having concluded the Legal Aid funds should not have been transferred to the City because they were simply 'amounts on deposit in the Housing Fund,' the court does not reach DOF's argument the Legal Aid funds do not meet the definition of a housing asset."

In addressing the issue of whether the subject funds were contractually restricted for the funding of an enforceable obligation under section 34179.5, subdivision (c)(5)(D), the court expressly acknowledged that the Agreement was a legally binding and enforceable contract. But the court then emphasized the language of the Agreement in which the parties agreed that the subject funds were to be "maintained and disbursed in

15

accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL], as the same may from time to time be amended." The court stated that the subject funds "would become part of the [LMI] Housing Fund, to be maintained and disbursed as required by the [CRL] *or any amendments thereto*" and noted that the CRL was amended by the Dissolution Law. (Bold omitted.) In a footnote, the trial court stated that, contrary to plaintiffs' contention that the Dissolution Law did not actually amend the CRL provisions related to affordable housing, the Dissolution Law "obviously amended the [CRL] by, among other things, dissolving redevelopment agencies and reallocating the monies in their Housing Funds." The court then ruled that the subject funds were not legally or "contractually dedicated or restricted *for the funding of* an enforceable obligation that identifies the nature of the dedication or restriction and the *specific enforceable obligation*" under section 34179.5, subdivision (c)(5)(D). (Bold omitted.) The court noted that the funds were never spent and the RDA "never contractually obligated or pledged the LAS funds to pay for specific housing projects, or any other enforceable obligation, prior to its dissolution." The court reasoned that "[t]o be exempt from transfer to other local entities by [section 34179.5] subdivision (c)(5)(D), the RDA must have pledged the LAS funds to fund a specific enforceable obligation. Because the RDA did not, the Dissolution Law directs those funds now be transferred to other local entities." The court stated: "[a]lthough the LAS funds originated pursuant to an enforceable obligation, they were not thereafter dedicated to *funding* an enforceable obligation. The . . . Agreement merely required the RDA to deposit the LAS funds into the Housing Fund and disburse those funds as required by law. The law now requires those funds be transferred to other local entities, unless the funds were pledged to pay for a specific enforceable obligation. They were not. The court thus finds the LAS funds are not contractually dedicated to the funding of any enforceable obligation within the meaning of the Dissolution Law."

The trial court then went on to rule that the subject funds were not "legally restricted as to purpose" under section 34179.5, subdivision (c)(5)(B). The court noted that amounts legally restricted as to purpose "could include the proceeds of any *bonds, grant funds, or funds provided by other governmental entities that place conditions on their use*," but reasoned that the Agreement was none of these things. (Bold omitted.) Therefore, according to the court, the funds "simply do not come within the plain language of [section 34179.5] subdivision (c)(5)(B)." The court further stated: "prior to the Dissolution Law, *all* monies in the Housing Fund were restricted as to purpose by the [CRL] itself, which required the monies be set aside and used to provide low and moderate income housing. [Citations.] If the Legislature intended the entire Housing Fund survive the Dissolution Law intact, it presumably would have said so. Instead, the Legislature expressly provided only restrictions imposed by bonds, grants or other governmental entities survive. The court thus finds that, unless specifically exempted, the Legislature intended *all* monies in the Housing Fund be distributed to local taxing entities." (Bold omitted.)

The trial court also rejected plaintiffs' contention that DOF's interpretation of the relevant statutes worked an unconstitutional impairment of contract. The court first observed that Redwood City lacked standing to assert a contract clause challenge. As for LAS, the court reasoned that since the Agreement expressly contemplated changes in the CRL and the Dissolution Law worked such a change, LAS "may not complain now that its contract rights have been impaired or taken by an amendment to the law it expressly recognized might occur. That LAS did not anticipate the particular amendment the Legislature ultimately enacted does not invalidate the Legislature's actions."

The trial court entered judgment denying the petitions and awarding costs. We granted plaintiffs' motion to consolidate the appeals.

17

## DISCUSSION

## I. Statutory and Contract Interpretation and Plaintiffs' Contentions

The matters at issue here turn, in part, on statutory interpretation. " 'The rules governing statutory construction are well established. Our objective is to ascertain and effectuate [the] legislative intent.' [Citations.] . . . In determining legislative . . . intent, we first look to the language itself. [Citation.] 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' [Citation.] 'But the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . .' " (*City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1034-1035 (*Cerritos*).)

"Our task is simply to interpret and apply the language of a statute . . . so as to effectuate the Legislature's . . . intent. [Citation.] [¶] Courts must also construe words in context, 'keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Every statute, then, should be construed in light of the whole system of law of which it is a part, so that all may be harmonized and have effect." (*Cerritos, supra*, 239 Cal.App.4th at p. 1035.)

With regard to the interpretation of the Dissolution Law statutes, "[w]hile we accord at least ' "weak deference" ' to an agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so [citation], the issue nonetheless is one subject to our de novo review." (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 47.)

These appeals also implicate contract interpretation. "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed

18

governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citations.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citations], controls judicial interpretation. [Citation.]' [Citations.] A . . . provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.)

As it did in the trial court, DOF concedes on appeal that the Agreement is a contract. We agree.

Redwood City asserts on appeal that the Agreement coupled with the CRL required the subject funds, which had been deposited into the LMI Housing Fund, to be "used to increase, improve, and preserve the supply of low- and moderate-income housing within the territorial jurisdiction of the agency." (§ 33334.3, subd. (c).) We agree with this assertion insofar as it applies to the circumstances prior to the enactment of the Dissolution Law. However, this appeal turns on the effect the enactment of that law had on the Agreement and the funds deposited into the LMI Housing Fund pursuant thereto. Redwood City also asserts that the Dissolution Law "did not amend the allowable purposes for disbursement of [LMI] Housing Funds set forth in the" CRL. Again, this is true, as far as it goes.

We must determine whether an exception to remittance applies by virtue of the binding nature of the Agreement. Plaintiffs assert three related theories: (1) the contract is an enforceable obligation under section 34171, subdivision (d)(1)(E), and a housing asset under section 34176, subdivision (e)(2); (2) the funds are restricted as to purpose under subdivision (c)(5)(B) of section 34179.5; and (3) the funds are contractually

19

dedicated or restricted for funding of an enforceable obligation under subdivision (c)(5)(D) of section 34179.5.  As we explain, we agree with all three arguments.

## II.  Transfer of Funds as a Housing Asset

The trial court ruled that the subject funds were unencumbered.  The court further determined that, even if the funds satisfied the definition of "housing assets" under section 34176, subdivision (e)(2), a determination it ultimately did not make, subdivision (a)(1) of that section prohibited the funds from being transferred to the LMI Housing Asset Fund.  Subdivision (a)(1) of section 34176 provides that "The city, county, or city and county that authorized the creation of a redevelopment agency may elect to retain the housing assets and functions previously performed by the redevelopment agency.  If a city, county, or city and county elects to retain the authority to perform housing functions previously performed by a redevelopment agency, all rights, powers, duties, obligations, and housing assets, as defined in subdivision (e), *excluding any amounts on deposit in the* [*LMI Housing Fund*] and enforceable obligations retained by the successor agency, shall be transferred to the city, county, or city and county."  (Italics added.)  Isolating this language, the trial court reasoned that, " 'amounts on deposit in the [LMI Housing Fund]' . . . should ***not*** have been transferred to the City."

Thus, in summary, the trial court ruled that the subject funds were not eligible to be transferred to Redwood City under section 34176, subdivision (a) as a housing asset because: the funds were deposited into the LMI Housing Fund; the RDA had no duty to, and did not, segregate the subject funds from other funds on deposit in the LMI Housing Fund; section 34176, subdivision (a)(1), specifically excludes from the funds to be transferred to the city as housing successor those funds on deposit in the LMI Housing Fund; and according to the trial court's reasoning, such funds *are absolutely not* to be transferred to the city.

However, as pointed out by LAS, the trial court's conclusion, in effect, that funds in the LMI Housing Fund are under no circumstances to be transferred to the successor

agency or housing successor is in conflict with other provisions of the Dissolution Law. For example, while section 34177 requires that "the *unencumbered* balance of the [LMI] Housing Fund of a former redevelopment agency" shall be remitted to the county auditor-controller for distribution to the taxing entities (§ 34177, subd. (d)), that provision necessarily suggests that there may be an *encumbered* balance in that fund. In interpreting statutes, "[c]ourts must . . . construe words in context, 'keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Every statute . . . should be construed in light of the whole system of law of which it is a part, so that all may be harmonized and have effect." (*Cerritos, supra*, 239 Cal.App.4th at p. 1035.) In our view, the language from section 34176, subdivision (a)(1), is not determinative here.

### III.  Enforceable Obligation / Housing Asset
### – Sections 34171, subdivision (d)(1)(E), and 34176, subdivision (e)(2)

We have rejected the premise that subdivision (a)(1) of section 34176 controls. We turn to the question of whether the funds constituted a housing asset.

Under section 34176, subdivision (e)(2), a housing asset includes "*[a]ny* funds that are *encumbered by an enforceable obligation to build or acquire low- and moderate-income housing*, as defined by the [CRL]." (Italics added.) (See fn. 7, *ante*.) Under section 34171, subdivision (d)(1)(E), an enforceable obligation includes "[*a*]*ny* legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (Italics added.) Thus, there are two components to this definition of enforceable obligation: (1) *any* legally binding and enforceable agreement or contract and (2) the agreement or contract is not void as violating the debt limit or public policy. The use of the word "any" in section 34171, subdivision (d)(1)(E) pertaining to enforceable obligations cannot be ignored. It "reflects expansiveness, not limitation. 'From the earliest days of statehood the courts have interpreted "any" to be

21

broad, general, and all embracing." (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 309, fn. 10 (*Emeryville*).) Thus, the use of the word "any" with regard to the legally binding agreements connotes *all* such agreements with the exception of those that violate the debt limit or public policy.

As noted, DOF concedes that the Agreement constituted a "legally binding and enforceable agreement or contract." (§ 34171, subd. (d)(1)(E).) We further note that LAS's objective under the Agreement was the pursuit of affordable housing on behalf of its clients. The subject funds were to be "maintained and disbursed in accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the" CRL. Thus, the Agreement could be deemed to serve the purpose of "build[ing] or acquir[ing] low- and moderate-income housing, as defined by the" CRL. (§ 34176, subd. (e)(2).) Accordingly, based on the plain language of section 34171, subdivision (d)(1)(E), the Agreement is an enforceable obligation; it qualifies as "[*a*]*ny* legally binding and enforceable agreement or contract." And as we next discuss, it "is not otherwise void as violating the debt limit or public policy."

According to an implementation plan for the Project Area for January 2010 through December 2014, prepared for Redwood City in December 2009, the "Bond Indebtedness Limit" was $119 million. The Agreement, committing a total of $11,917,200 in tax increment funds, did not violate the debt limit and DOF does not assert that it does.

As for public policy, we note that section 34171, subdivision (d)(1)(E) does not identify any particular public policy. For example, it does not specifically identify the primary policy underlying the Dissolution Law, i.e., "that tax increment revenue should be released to local taxing entities for use by 'local governments to fund core governmental services' such as fire protection, police, and schools." (*City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 385 (*Galt*), quoting § 34167, subd. (a).) Instead, the reference to "public policy" in subdivision (d)(1)(E) of section 34171 is generic.

22

Consequently, other public policies are in play. For example, providing affordable housing, the goal of the Agreement, also furthers public policy. (See *City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1427 ["Certainly, the provision of housing for low and moderate income persons [in the CRL] is in keeping with the public policy of this state"].) The Dissolution Law did not take this public policy off of the table. Sections 33334.2 and 33334.3, which pertain to funding for low- and moderate-income housing were not amended in the Dissolution Law. And in our view, the policy interests concerning the redistribution of tax increment and the provision of affordable housing are not necessarily mutually exclusive. The Legislature contemplated and provided for honoring existing enforceable obligations in the Dissolution Law. While the Legislature did intend "to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies" for use "by local governments to fund core governmental services including police and fire protection services and schools," the Legislature specifically provided that this mandate excepted "those assets and revenues *that are not needed to pay for enforceable obligations*." (§ 34167, subd. (a), italics added.)[8] And the Dissolution Law contemplated that some enforceable obligations would pertain to the provision of low- and moderate-housing. (§§ 33334.2, 33334.3, 34176, 34176.1.) We conclude that the Agreement, when it was entered into and following the enactment of the Dissolution Law, did not violate public policy.

---

[8] We also note that, while section 34167, subdivision (a), states that "[a]ll provisions *of this part* shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible," that provision appears in, and by its terms applies to, part 1.8. (Italics added.) However, that statement of intent does not mean we must ignore the plain language related to the exception to remittance for enforceable obligations and the definition of enforceable obligation in section 34171, subdivision (d)(1)(E) and section 34167, subdivision (d)(5), both of which appear in part 1.85.

23

Having concluded that the Agreement constituted an enforceable obligation, there remains the question of whether the subject funds were encumbered. This task is complicated by the fact that, unlike "[e]nforceable obligation" (§ 34171, subd. (d)(1)), part 1.85 does not contain a clear definition of "encumbered" or "unencumbered" applicable to the entirety of the Dissolution Law.[9]

On this issue, we asked the parties to provide supplemental briefing on *Cuenca, supra*, 8 Cal.App.5th 200, a case decided by another panel of this court. In *Cuenca,* five stipulated judgments required the setting aside of percentages of the tax increment to fund low- and moderate-income housing. (*Id*. at pp. 212, 225.) The *Cuenca* court noted that, pursuant to section 34177, subdivision (d), unencumbered funds must be transmitted to the county auditor-controller for return to the taxing entities. (§ 34177, subd. (d).) Although the court concluded the stipulated judgments were enforceable obligations, it concluded the funds that had already been set aside pursuant to those judgments before the enactment of the Dissolution Law were unencumbered and subject to being remitted to the county auditor-controller. (*Id*. at pp. 221, 227.) The instant case is different and we reach a different result here.

---

[9] Section 34162 in part 1.8 forbids agencies from taking any action to incur indebtedness, including "[p]ledg[ing] or encumber[ing], for any purpose, any of its revenues or assets." (§ 34162, subd. (a)(6).) That subdivision further states: "*As used in this part*, to 'pledge or encumber' means to make a commitment of, by the grant of a lien on and a security interest in, an agency's revenues or assets, whether by resolution, indenture, trust agreement, loan agreement, lease, installment sale agreement, reimbursement agreement, mortgage, deed of trust, *pledge agreement, or similar agreement* in which the pledge is provided for or created." (Italics added.) This definition of "pledge or encumber" in part 1.8 does not provide a universally applicable definition of "encumber" for purposes of the Dissolution Law; by its terms, it applies only to part 1.8. To the extent that it is applicable, we are of the view that an agreement such as that at issue here satisfies this definition of "encumber."

24

In *Cuenca*, the court addressed two aspects of the stipulated judgments at issue there, the set-aside of specific percentages of the tax increment and the funds already collected pursuant to that set-aside. (*Cuenca*, *supra*, 8 Cal.App.5th at pp. 222-227.) As to the set-aside of specified percentages of tax increment, the court reasoned the legislative elimination of the tax increment had the effect of extinguishing the obligation to continue to set aside anything because any percentage of zero is zero. (*Id*. at p. 223.) Importantly, the court then expressly noted, "None of the stipulated judgments guaranteed any minimum level of funding for low- and moderate-income housing projects in the City." (*Ibid*.) Here, that is exactly what the Agreement did. It guaranteed a specific amount of funding for low- and moderate-income housing.

The *Cuenca* court then went on to address the balance of funds that had been collected before the elimination of the tax increment in the Dissolution Law. The court again noted that the stipulated judgments required only the setting aside of percentage portions of the tax increment, and then noted, "the stipulated judgments themselves do not constitute contracts to construct any housing." (*Cuenca*, *supra*, 8 Cal.App.5th at pp. 222, 225.) The court went on to state: "the enforceable obligation[10] is the requirement that a percentage of the tax increment be set aside. Once set aside, the tax increment moneys . . . are unencumbered unless subject to specific and enforceable agreements such as contracts for construction or pledges for construction loans." (*Id.* at

---

**10** The court in *Cuenca* concluded that the stipulated judgments met the definition of enforceable obligations under section 34171, subdivision (d)(1)(D). (*Cuenca*, *supra*, 8 Cal.App.5th at p. 221.) Subdivision (d)(1)(D) of section 34171 is one of several alternative definitions of enforceable obligations. It includes: "Judgments or settlements entered by a competent court of law or binding arbitration decisions against the former redevelopment agency, other than passthrough payments that are made by the county auditor-controller pursuant to Section 34183." The panel in *Cuenca* did not analyze subdivision (d)(1)(E) of section 34171, the definition of enforceable obligation we address in this case.

25

p. 227.) However, the *Cuenca* court cited no specific statute requiring funding be earmarked for specific projects in order to be encumbered.[11] In any event, given the *Cuenca* court's recognition that none of stipulated judgments therein "guaranteed any minimum level of funding for low- and moderate-income housing projects" (*id*. at p. 223), it appears that court's holding is limited to the facts presented there, where the stipulated judgment or agreement does not guarantee any minimum level of funding or a specific amount of funding for low- and moderate-income housing projects. Here, the Agreement, which required a deposit of a sum certain, created an encumbrance on those funds. The contractual right to those funds was vested. (Cf. *id*. at p. 230 [concluding that "the stipulated judgments incorporated no vested right to receipt or disposition of tax levies"].)

Thus, we conclude that the Agreement and the subject funds deposited into the LMI Housing Fund pursuant thereto constituted an enforceable obligation within the meaning of section 34171, subdivision (d)(1)(E), and, in turn, constituted a housing asset within the meaning of section 34176, subdivision (e)(2). We further conclude the funds were encumbered and appropriately transferred to the LMI Housing Asset Fund. We shall nonetheless proceed to consider the DOF DDR determinations upheld by the trial court, specifically whether the Agreement funds were (1) "legally restricted as to purpose" (§ 34179.5, subd. (c)(5)(B)), or (2) "legally or contractually dedicated or

---

[11] The panel in *Cuenca* cited only section 34177, subdivision (d) which, as we have noted, provides that successor agencies are required to "[r]emit unencumbered balances of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities, including, but not limited to, the *unencumbered balance* of the Low and Moderate Income Housing Fund of a former redevelopment agency." But this provision gives no guidance on what is required for funds to be encumbered.

26

restricted for the funding of an enforceable obligation . . ." (*id.*, subd. (c)(5)(D)).[12]  Our determinations concerning these considerations further bolsters our conclusion that the subject funds here were encumbered.

## IV.  DDR Determinations

### A.  Legally Restricted as to Purpose - Section 34179.5, Subdivision (c)(5)(B)

#### 1.  Plaintiffs' Contentions

Plaintiffs assert that the subject funds are "legally restricted as to purpose" and thus are not available for disbursement to the county auditor-controller for distribution to other local taxing agencies pursuant to section 34179.  (§ 34179.5, subd. (c)(5)(B).)  Redwood City asserts that the funds at issue are legally restricted as to purpose because the valid, binding, and enforceable Agreement restricts the purposes for which the funds can be used.  According to plaintiffs, the trial court erred in limiting the scope of section 34179.5, subdivision (c)(5)(B), to "bonds, grant funds, or funds provided by other governmental entities that place conditions on their use," where, according to plaintiffs, those categories are merely examples of what might qualify under that subdivision and do not represent the exhaustive and complete list of what can qualify.  We agree with plaintiffs.

#### 2.  Pertinent Statutory Language

Section 34179.5, added by AB 1484, mandates "an audit of successor agencies to determine whether unobligated tax increment revenues were available for transfer to

---

[12]  LAS asserts that the fact that DOF approved of the Agreement on ROPS I and II demonstrates that the Agreement constitutes an enforceable obligation.  This would seem to present an estoppel argument.  However, we have rejected a similar argument previously, stating that the strong public policy represented by the Dissolution Law "would be unjustifiably nullified if local agencies were allowed to cite earlier actions of DOF, which made preliminary and perhaps unstudied decisions, to claim that the public policy decisions of the Legislature cannot be given effect."  (*Galt, supra*, 12 Cal.App.5th at p. 385.)

taxing entities. [Citations.] This due diligence review (DDR) [citation] identified '[t]he dollar value of assets and cash . . . transferred after January 1, 2011, through June 30, 2012, by the redevelopment agency or the successor agency to [a sponsoring entity] and the purpose of each transfer.' [Citation.] Assembly Bill No. 1484 required the successor agency to submit the results of this audit to the successor agency's oversight board [citation] and to the [DOF], which had the authority to adjust any amounts in the DDR." (*Grass Valley, supra*, 17 Cal.App.5th at p. 574.)

Subdivision (c) sets forth the minimal requirements of what must be included in the DDR mandated by section 34179.5. As pertinent here, section 34179.5, subdivision (c)(5)(B) requires: "[a] separate accounting for the balance for the [LMI] Housing Fund for all other funds and accounts combined shall be made as follows: [¶] . . . [¶] (B) An itemized statement listing *any amounts that are legally restricted as to purpose* and cannot be provided to taxing entities. This *could include* the proceeds of *any bonds, grant funds, or funds provided by other governmental entities* that place conditions on their use." (Italics added.) As we shall discuss, the words "could include" are important to our interpretation of this provision's language.

### 3. Analysis

We note that, as of this writing, there is no published case law interpreting the language from section 34179.5, subdivision (c)(5)(B), which address funds that are "legally restricted as to purpose" and that, as a result, "cannot be provided to taxing entities."

We conclude that the subject funds under the Agreement are indeed "legally restricted as to purpose." (§ 34179.5, subd. (c)(5)(B).) The Agreement stated that it represented an accommodation between the objectives of the redevelopment plan and "the objectives sought by LAS on behalf of its clients who need affordable housing." Under the Agreement, the former RDA agreed to deposit $11,917,200 in tax increment funds into the LMI Housing Fund which were to be "maintained and disbursed in

28

accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL], as the same may from time to time be amended."

Thus, given the plain language of the statute, the funds were "legally restricted as to purpose" (§ 34179.5, subd. (c)(5)(B)), specifically to maintenance and disbursement "in accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL] . . . ." If statutory language " 'is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' " (*Cerritos, supra*, 239 Cal.App.4th at p. 1034, quoting *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 (*Lungren*).) We find the operative language of section 34179.5, subdivision (c)(5)(B), to be clear and unambiguous. As a result, these funds could not be provided to other taxing entities. (§ 34179.5, subd. (c)(5)(B).)

Furthermore, the plain meaning of the statutory language comports with the statutory purpose. (*Cerritos, supra*, 239 Cal.App.4th at p. 1034, quoting *Lungren, supra*, 45 Cal.3d at p. 735 [" 'the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . .' "].) Section 34167, subdivision (a), provides that part 1.8, the freeze component, "is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are *not needed to pay for enforceable obligations* may be used by local governments to fund core governmental services including police and fire protection services and schools." In *Galt*, this court stated that the "obvious shift in legislative intent" from the former redevelopment statutes to the Dissolution Law "is that tax increment revenue is to be preserved for taxing entities *to the extent it is not necessary to fund current enforceable obligations of the former redevelopment agency*." (*Galt, supra*, 12 Cal.App.5th at p. 383, italics added.) We conclude that our determination that the funds at issue here are "legally restricted as to purpose" and that, as a result, they "cannot be provided to taxing entities" (§ 34179.5, subd. (c)(5)(B)) comports with the legislative purposes behind the Dissolution Law:

29

preserving tax increment revenue for taxing entities "*to the extent it is not necessary to fund current enforceable obligations of the former redevelopment agency*." (*Galt*, at p. 383, italics added.)

As plaintiffs point out, the trial court's reading of section 34179.5, subdivision (c)(5)(B), limited its scope to "bonds, grant funds, or funds provided by other governmental entities that place conditions on their use." In rejecting plaintiffs' argument concerning this subdivision, the trial court stated: "the [Agreement] funds are not bond proceeds, grant funds, or conditional funds provided by other governmental entities. The [Agreement] funds simply do not come within the plain language of subdivision (c)(5)(B)." We agree with plaintiffs that the trial court's reasoning improperly restricted the scope of this subdivision to the listed items. Here, the words "could include" in subdivision (c)(5)(B) are important. Those words signal a list of examples of funds which are "legally restricted as to purpose," but at the same time indicate the list is not exclusive. (See *People v. Laird* (2018) 27 Cal.App.5th 458, 468 [list in Penal Code provision "is nonexhaustive; ' "the words 'include' and 'including' are ordinarily words of enlargement, and not of limitation" ' "]; *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 717 ["the word 'including' in a statute is 'ordinarily a term of enlargement rather than limitation' "].)

DOF does not adopt the trial court's reading of this subdivision as strictly limiting its scope to "bonds, grant funds, or funds provided by other governmental entities that place conditions on their use." Rather, DOF expands its consideration of the subdivision beyond the three listed examples to include similar types of funds and states that the Agreement neither constitutes one of these listed items nor is it "anything similar." DOF asserts that a similarity among the three listed items is that the money at issue "reflects a third party's commitment or pledge of its own funds to an RDA with an expectation of restrictions on the use of the money." DOF attempts to distinguish the present facts,

30

asserting that the money that is the subject of the Agreement "does not reflect a third party's commitment or pledge of its own restricted funds."

DOJ's argument appears to advance the rule of statutory construction known as *ejusdem generis*. "This doctrine provides that 'when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.' " (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 213.) "Maxims of statutory construction, including the doctrine of *ejusdem generis*, are not immutable rules but instead are guidelines subject to exceptions. [Citation.] 'In construing a statute a court's objective is to ascertain and effectuate the underlying legislative intent. [Citation.] This fundamental rule overrides the *ejusdem generis* doctrine, just as it would any maxim of jurisprudence, if application of the doctrine or maxim would frustrate the intent underlying the statute.' '[E]*jusdem generis* is only an aid in getting the meaning and does not warrant confining the operations of a statute within narrower limits than were intended.' " (*Ibid.*) Here, as we have noted, our plain-meaning reading comports with the statutory purpose.

In the Agreement, concerned with "the objectives sought by LAS on behalf of its clients who need affordable housing," the former RDA committed a sum certain to be "maintained and disbursed in accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL] . . . ." Under the plain meaning and clear and unambiguous language of section 34179.5, subdivision (c)(5)(B), we conclude that these funds were "legally restricted as to purpose," and, as a result, they "cannot be provided to taxing entities."

DOF also points to the Agreement's language "*as the same may from time to time be amended*," arguing that this qualified any restrictive use of the funds. (Italics added.) It is beyond dispute that the Dissolution Law amended the CRL in various respects (see, e.g., § 34189, subd. (a) [declaring inoperative a number of provisions of the CRL that depend on the allocation of tax increment to RDAs]), and Redwood City acknowledges

as much.  However, various provisions of the Dissolution Law clearly contemplated the ongoing viability of enforceable obligations (see, e.g., §§ 34167, subd. (d), 34171, subd. (d), 34177, subds. (a), (c), 34177.3, subds. (a), (c)), and recognized that certain funds were encumbered as housing assets (§ 34176, subd. (e)(2)).  And the Dissolution Law did not render inoperative any relevant terms that apply to the housing funds of [RDAs] in California as set forth in the CRL so as to nullify the Agreement.  As LAS points out, no provision "that depend[s] on the allocation of tax increment to redevelopment agencies" and which was rendered inoperative by the Dissolution Law (§ 34189, subd. (a)), is at issue here; instead, here we are addressing preexisting funds already on deposit pursuant to the Agreement which constitutes an enforceable obligation, and those funds are to be "maintained and disbursed in accordance with the terms that apply to the housing funds of [RDAs] in California as set forth in the [CRL] . . . ."  Such provisions of the CRL would include sections 33334.2 and 33334.3, which were not amended or rendered inoperative by the Dissolution Law.  Therefore, as we have concluded that the Agreement and the subject funds were legally restricted as to purpose and could not be provided to taxing entities under the Dissolution Law (§ 34179.5, subd. (c)(5)(B)), we further conclude the fact that the Agreement contemplated and incorporated amendments to the CRL did not result in the nullification of the Agreement.

**B.  Legally or Contractually Dedicated or Restricted for the Funding of an Enforceable Obligation - Section 34179.5, Subdivision (c)(5)(D)**

**1.  Plaintiffs' Contentions**

Plaintiffs also assert that the funds are not available for disbursement to the county auditor-controller for another reason:  they "are legally or contractually dedicated or restricted for the funding of an enforceable obligation . . . ."  (§ 34179.5, subd. (c)(5)(D).)  LAS asserts that DOF and the trial court erroneously interpret section 34179.5, subdivision (c)(5)(D) as requiring that the subject funds be committed to a specific housing project or some other "second specific agreement."  According to LAS, no

language in the relevant statutes contains such a requirement, and therefore DOF and the trial court have impermissibly created it. We again agree with plaintiffs.

### 2. Pertinent Statutory Language

Section 34179.5, subdivision (c)(5)(D) requires the review mandated by section 34179.5 include "[a]n itemized listing of any current balances that are legally or contractually dedicated or restricted for the funding of an enforceable obligation that identifies the nature of the dedication or restriction and the specific enforceable obligation." For purposes of section 34179.5, " 'Enforceable obligation' includes [1] any of the items listed in subdivision (d) of Section 34171, [2] contracts *detailing specific work to be performed* that were entered into by the former redevelopment agency prior to June 28, 2011, with a third party that is other than the city, county, or city and county that created the former redevelopment agency, and [3] indebtedness obligations as defined in subdivision (e) of Section 34171." (§ 34179.5, subd. (b)(2), italics added.)

### 3. Analysis

As with subdivision (c)(5)(B) of section 34179.5, we have found no published case law interpreting the relevant language of subdivision (c)(5)(D). We conclude that the Agreement, and the resulting funds, were "contractually dedicated or restricted for the funding of an enforceable obligation that identifies the nature of the dedication or restriction and the specific enforceable obligation." (§ 34179.5, subd. (c)(5)(D).)

DOF asserts that section 34179.5, subdivision (c)(5)(D), requires "a specific enforceable obligation, beyond the initial dedication or restriction of funds, to avoid remittance." However, as LAS argues, no such specific requirement appears in the statute, and if the Legislature intended to include such a requirement, it would have done so. DOF asserts that, "even assuming *arguendo* that the [Agreement] sufficiently identified the nature or such a dedication or restriction on the associated funds, there is no evidence of any 'specific enforceable obligation,' i.e., no specific housing-development contracts." Once again, what DOF does not do is direct us to any statutory requirement

33

that plaintiffs identify a "specific housing-development contract[]" to establish that the subject funds are encumbered for present purposes. We find no such requirement in the statutory scheme. Instead, we find the contrary.

For purposes of the DDR process established by AB 1484, the Legislature listed three separate categories of enforceable obligations in section 34179.5, subdivision (b)(2). This court recognized as much in *Emeryville, supra,* 233 Cal.App.4th 293, where we noted that section 34179.5, subdivision (b)(2) "confirms that an enforceable obligation 'includes any of the items listed' in section 34171, subdivision (d) and *adds two further types of enforceable obligations*, namely, '*contracts detailing specific work to be performed that were entered into by the former redevelopment agency prior to June 28, 2011, with a third party that is other than the city ... that created the former redevelopment agency*, and indebtedness obligations as defined in subdivision (e) of Section 34171." (*Emeryville*, at p. 309, fn. 10, italics added.) There would have been no reason for the Legislature to add "contracts detailing specific work to be performed" as a separate category of enforceable obligation if such contracts were required to qualify an agreement as an enforceable obligation under section 34171, subdivision (d)(1)(E) or any of the other alternatives under subdivision (d) of section 34171. Thus, the addition of "contracts detailing specific work" to the list of enforceable obligations, which list also separately includes enforceable obligations under section 34171, subdivision (d) -- which necessarily includes "*[a]ny* legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy" -- suggests the opposite of what DOF argues. It suggests that any of the items in section 34171, subdivision (d) are enforceable obligations without the requirement of contracts detailing specific work, such as the Agreement here.[13]

---

[13] We note that the court in *Cuenca*, *supra*, 8 Cal.App.5th 200, was apparently not called upon to interpret or consider section 34179.5, subdivision (b)(2) when it concluded that

34

DOF also asserts that the funds deposited into the LMI Housing Fund were not encumbered as a result of their deposit into that fund, "despite having had a previous statutory restriction (for affordable housing) on the money's use . . . ." DOF cites section 34177, subdivision (d), discussing *unencumbered* balances in LMI Housing Fund accounts. (See fn. 11, *ante*.) The subject funds were indeed to be deposited and kept in the LMI Housing Fund, and under the Agreement, Redwood City had no obligation to segregate the subject funds from other funds on deposit in that fund. However, in our view, the problem with DOF's position is that the sum certain representing the subject funds was encumbered under the Agreement for use for affordable housing purposes consistent with the CRL notwithstanding the fact that they were commingled with other unencumbered funds which were also on deposit in the LMI Housing Fund.

DOF on several occasions characterizes the Agreement and the resulting funds as, essentially, nothing more than what was required under the CRL. (See fn. 4.) We disagree with this characterization. We read the Agreement, against the background of the CRL and subsequently the Dissolution Law, as calling for the deposit of a sum certain into a preexisting account (in which the funds would be commingled with other funds), above and beyond funds statutorily required to be deposited in that account and committed to affordable housing purposes. We do not agree with DOF to the extent that it asserts that, as a result of the choice to deposit the subject funds into the LMI Housing Fund, the previously encumbered funds, in effect, became unencumbered.

We conclude that the subject funds were "legally or contractually dedicated or restricted for the funding of an enforceable obligation that identifies the nature of the dedication or restriction and the specific enforceable obligation." (§ 34179.5, subd. (c)(5)(D).)

---

specific contracts for construction or pledges for construction loans were required to encumber funds on deposit pursuant to an enforceable agreement to avoid remittance. Subdivision (b)(2) of section 34179.5 is not mentioned in the opinion.

## V. Unconstitutional Impairment of Contract

LAS asserts that the Dissolution Law as applied had the effect of violating the contract clauses of the federal and state Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

We need not address this contention. We have determined that DOF improperly disallowed the subject funds at issue here under the statutory scheme and that DOF is compelled to acknowledge the validity of the Agreement and the $10,272,916 that are the subject of that Agreement as an enforceable obligation, a housing asset, and as funds legally restricted as to purpose and legally or contractually dedicated or restricted for the funding of an enforceable obligation.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with instructions to vacate its order denying plaintiffs' petitions for writ of mandate and dismissing plaintiffs' complaint for declaratory and injunctive relief and to enter a new order granting plaintiffs' writ petitions consistent with this opinion and granting such other relief as the trial court may deem appropriate. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)


/s/
MURRAY, J.


We concur:


/s/
BLEASE, Acting P. J.


/s/
ROBIE, J.


36